**Mrs. Annie Laurie REWIS, Adm., Estate of Joann Rewis et al., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 1508.**

United States District Court
S. D. Georgia.

Sept. 26, 1969.

---

2. This is disputed in the personnel file by Captain Doscher.

Joseph Bergen, Savannah, Ga., for plaintiff.

Reeves Lewis, Asst. U. S. Atty., Savannah, Ga.; Thomas L. Young, Atty., Dept. of Justice, Washington, D. C.

## JUDGMENT

LAWRENCE, Chief Judge.

This is a suit by the parents of a fifteen-months-old child against the United States under the Federal Torts Claims Act for damages in the amount of $1,187,250.00 for the death of the infant which allegedly resulted from the malpractice of an Army physician in failing to diagnose a case of aspirin poisoning and consequent negligent care and treatment of the patient.

The case was tried before Judge Scarlett in the Spring of 1965 and on November 23, 1965, he rendered a judgment in favor of the Government. An appeal was taken by plaintiffs.

One of the prime issues in the case was whether Dr. R. H. Finley, a physician at the Air Force Hospital, Walker Air Force Base, New Mexico, should have made a diagnosis of heavy aspirin ingestion on the night of September 4, 1963, when he examined the child rather than concluding that she was only suffering from a viral illness. Among plaintiffs' witnesses were two Savannah physicians, Dr. E. C. Shepherd and Dr. Harry E. Rollings. Lengthy hypothetical questions were addressed to them by plaintiffs' counsel. Each witness testified to the effect that normal medical examination required more than listening to the child's chest with a stethoscope, examining her throat and ears and taking her temperature. The physicians further testified that over-breathing (hyperventilation) was a danger signal and that irrespective of any lack of history of access to aspirin, immediate tests should have been made by the examining physician (who was Medical Officer of the Day) to determine the cause of the key symptom.

On cross-examination, Government counsel elicited a modification in part of the conclusions of these two experts by including in the assumed facts the statement that at the time of the examination (9:45 P.M.) the patient was

"crying."[1] As a result of the phrasing of the defendant's hypothetical question, Dr. Shepherd assumed that the child was breathing normally and was sitting quietly on her father's lap when examined.

Citing Watson v. United States, 5 Cir., 346 F.2d 52, the trial Court held that the plaintiffs could not recover "because there was no evidence to show that the alleged malpractice was the cause of the child's illness and subsequent death." Judge Scarlett further found that the testimony and also the death certificate indicated that the child's demise was the proximate result of aspirin poisoning and hence there could be no recovery for any malpractice of the physician.

The Court of Appeals for the Fifth Circuit reversed this Court. See Rewis v. United States (1966), 369 F.2d 595. It held that Judge Scarlett had misconceived Watson v. United States, *supra,* in assuming that the holding required *specific* expert testimony that had there been a correct initial diagnosis, "a reasonable degree of medical certainty" existed that the patient's life could have been saved. The Court of Appeals further ruled that there was no evidence that the child was "crying vigorously" or breathing normally, as Dr. Shepherd assumed in modifying the testimony he had given on direct examination. The Court of Appeals conceived that this erroneous assumption may have been a decisive factor in the trial Court's ruling. The case was remanded for another trial with the right of the parties to introduce new evidence or to rely on the existing record.

The case was retried at Savannah on April 10–11, 1969. Under a stipulation of the parties, all testimony given at the first trial, except the deposition of Dr. A. L. Ageloff, (Captain, U.S.A.F.), was considered by the Court as though delivered at the retrial. Dr. Ageloff, who is now in private practice in New York, appeared in person.

There was both repetition and supplementation of evidence at the first trial. Sergent Rewis and Dr. E. C. Shepherd testified again and the Government presented two additional witnesses. They were Dr. Alan K. Done, a pediatrician from Salt Lake City, who, from a study of 38 poison cases, had formulated a graph of salicylate intoxication indicating significance of salicylate in blood in cases of acute ingestion.[2] The Government's other new witness was Dr. Bernard M. Portman, a Savannah pediatrician.

This background furnishes sufficient prelude to a discussion and consideration of the evidence. I need only add that as far as the law is concerned, there is no controversy. New Mexico law controls and while there is a paucity of decisional law in that State the principles governing suits for malpractice comport with the law in other jurisdictions. See Crouch v. Most, 78 N.M. 406, 432 P.2d 250 (1967); Cervantes v. Forbis, 73 N.M. 445, 389 P.2d 210 (1964).

In 1963 Sergeant Joseph S. Rewis, U.S.A.F., was stationed at Walker Air Force Base, Roswell, N. M., a city of 40,000 population. He and his wife were the parents of six children. The youngest of them, Joann, was fifteen months old in September of that year. The Rewis family lived in a private residence at Dexter approximately ten miles from Walker Air Base.

On September 4, 1963, Mrs. Rewis woke up feeling quite badly. After getting the older children off to school and feeding the others she went back to bed. She got up and ate lunch and then returned to bed. At that time the younger children were "fine." Her husband called about 2:30 to find out how she was. She was much worse and, in fact, passed out on the way back to her

---

1. The only evidence to support the theory that the child was crying at that time was that when Mr. Rewis returned to his house on the night of September 4th, he said, "We found my child crying," and that she was crying at 2:30 A.M. the next morning.

2. The article was published in Pediatrics, 1969, pp. 800–807.

bedroom. Sergeant Rewis returned to the house around 3:30 P.M. His two youngest children, one of whom was Joann, met him. They appeared normal at that time. His wife told him that she thought she would be all right if she got some rest. He prepared supper which he took to his wife's bedroom. She did not feel like eating. Sergeant Rewis then decided to take her to the Base Hospital. They arrived there about 7:00 P.M. and waited for two hours before she was examined by Dr. Finley. She had a temperature of 102° and complained of aching all over and having a sore throat and chills.[3] Medication was prescribed. Mrs. Rewis and her husband returned home around 10:00 P.M.

They found Joann crying. Her facial appearance was unusual. Her eyes stared and she had shadows under them. Mrs. Rewis went on to bed. The lady keeping the children said that Joann had vomited violently after eating and had a very bad case of diarrhea. The father testified that she was breathing deeply. Sgt. Rewis carried the child back to the hospital where a corpsman took her temperature, rectally. It was about normal —99.2°. When Dr. Finley came into the room Rewis gave him a history informing him about the vomiting and the diarrhea.[4] The physician informed him that the child had the same viral infection that the mother had but that it affected her a different way.[5] He prescribed a decongestant, baby aspirin every four to six hours, clear liquid diet, benedril expectorant, cough syrup and coca-cola syrup for the nausea. Joann was taken home by the father around midnight.

Dr. Robert H. Finley, a captain in the Air Force in 1963, received his medical education at the University of Michigan where he graduated in 1959. He is a specialist in internal medicine. According to Finley, the history given to him by Joann's father was that in the evening the child had started vomiting and having diarrhea and had not eaten well. "He mentioned the other children. I believe he said that two of his children at home had had similar illness,[6] and he stated that he had brought her in at this time because she had suddenly turned blue around the lips and this caused him concern." Dr. Finley used an otoscope to examine her ears, a flashlight and tongue blade to examine the back of the throat, and checked the sides of the neck and listened to the chest. He saw no evidence of blueness (cyanosis). "The child was fussy and irritable as you would expect of a sick child and at almost ten o'clock at night." Dr. Finley continued: "She was breathing somewhat rapidly and was very excited and seemed to be frightened by being examined by a doctor as is common with sick kids at 10:00 o'clock at night. The ear drums were unremarkable, the back of the throat was red and inflamed. There was hypertrophy of the lymphoid or tonsillar tissue on the back of the throat. There was a little bit appearance about this but there was no pus or exudate. The chest was clear, suggesting no pathology in the lungs. In view of the family history and in view of these findings I felt that Joann also had a viral infection involving the respiratory tract." [7]

Dr. Finley also testified that he first asked Sergeant Rewis if Joann had "any drugs or medicine earlier" so that he

---

3. These were the only symptoms noted by Dr. Finley on the record. Mrs. Rewis testified that she also felt nauseated.

4. The important issue as to whether he informed the physician about the possibility of Joann having ingested aspirin is in sharp dispute. I will later discuss that phase of the medical history.

5. Dr. Finley testified that there was a great deal of viral illness in the area at the time.

6. This was denied by plaintiffs.

7. Dr. Finley noted on the record that the child was "hyperventilating" (overbreathing) but testified that this term represented a routine observation and not an indication of any pathological condition.

could take this into account. The father replied very definitely, he said, that she had *not*. This is disputed by Rewis who swore that he told Finley there was a possibility that the child might have taken aspirin.

It seems that on the day in question when the Sergeant arrived home about 3:00 P.M. he found several aspirin tablets spilled on the floor. He stated that the next youngest child had gotten a bottle of adult aspirin from the cabinet in the kitchen. He asked his wife whether there was a chance they had eaten any and his wife replied, "I don't think so, because you know they won't hardly even take baby aspirin." Similarly, Mrs. Rewis said that she did not think the child had eaten aspirin because "as a rule it is hard to get them to take any medicine of any kind." At any rate, the father said he looked into the children's mouths to make sure. This was around 4:15 P.M. He was "relatively sure she had not, because there was absolutely no symptoms by her actions or otherwise even up until the time my wife and I left at 7:00 o'clock." He swept up the aspirin on the floor.

Of course, whether or not Dr. Finley was actually told as part of the history of the possibility of aspirin ingestion is not by any means determinative of the question of negligence. But it is highly material in explaining the diagnosis of the physician. In the opinion of the Court of Appeals it was said:

"Sgt. Rewis testified that when he took the child to the base hospital and when he was giving the history to the doctor, he told Dr. Finley, Joann might have had access to some aspirin in the afternoon. However, the trial court discredited this testimony in view of the contrary testimony by the doctor. The resolution of the conflict is certainly not only permissible but appears to us to be correct for it can hardly be conceived that, if given this clue, the doctor would have treated the patient as he did."

I agree. My conclusion of a negative history of exposure to aspirin is buttress-

ed by the testimony of Dr. Ageloff, pediatrician at the Walker Air Force Base who examined the child the following day around 12:30 P.M. By that time Joann was markedly hyperventilating. Ageloff testifed that she was "ten to fifteen percent dehydrated" and was breathing "very, very rapidly and very deeply." Sergeant Rewis was present. Dr. Ageloff asked him if she had taken any medicine. He replied that she had *not*. In an addendum to the medical report made in the case this physician said that Joann's father inquired of him as to the purpose of a blood test he was preparing to do and was told, "This will prove that the baby took aspirin." According to the report, Rewis thereupon "suddenly recalled that she had been playing with a bottle which contained approximately 300 adult aspirin the day before."

At any rate, the blood test revealed a salicylate level of 87.5 mg% which is exceedingly high. To bring to its sad conclusion this tragic story the child's coma deepened. Her pulse and respiratory rate rose. An exchange of blood by transfusion at Walker Air Base Hospital was ruled out. The nearest artificial kidney was at San Antonio and about 3:00 P.M. on September 5th the child was put aboard an aircraft to take her there. Enroute, she took a turn for the worse. The plane landed at Big Springs, Texas, where she was removed to a hospital. At 6:20 P.M. that afternoon little Joann Rewis breathed her last labored breath.

Assuming that no definite history of taking aspirin was presented to Dr. Finley, was there negligence in his failure to diagnose the case as one of salicylate poisoning? As already indicated, the doctors who testified differ widely. I have determined to accept Dr. Finley's version as to the appearance of the child and the symptoms at the time he saw her and as to the extent of his examination and his findings some six hours after the ingestion of aspirin. Nausea is an inevitable symptom of salicylate poisoning. Diarrhea can be but is not

a common one. These symptoms are consonant with a respiratory infection. Hyperventilation is associated with aspirin poisoning. Dr. Finley found that the child was "breathing somewhat rapidly." He attributed this to the late hour and to the excitement of the child being examined by a doctor. Her throat was red and inflamed and there was hypertrophy of the tonsillar tissue. The physician further testified: " * * * every sign that I found was compatible with and would be explained by a viral infection involving [the] respiratory tract, and since it was stated to me that she had taken no drugs or medicine I had no reason to suspect any aspirin poisoning or any kind of poisoning as far as that was concerned."

In answer to a hypothetical question, Dr. Done testified that it was doubtful that most physicians would have made a diagnosis of aspirin poisoning at the point Dr. Finley saw the child. He said that the diagnosis was supported by the symptoms and were not such, under the facts assumed, as to alert Dr. Finley to the possibility of aspirin poisoning absent a history of possibility of ingestion.

A Savannah pediatrician, Dr. Benjamin M. Portman, testified that the hypothetical facts (which I accept) were consistent with a disease of the upper respiratory tract. He emphasized the lack of history of aspirin poisoning and attributed considerable importance to the fact that the mother was then in bed with a viral infection.

Dr. Ageloff is a graduate of the medical school of the University of Virginia and is now a practicing pediatrician in New York. He is familiar with medical standards at Roswell, New Mexico and testified that, in his opinion, Dr. Finley adhered to them.

These opinions are strongly controverted by plaintiffs' experts. Dr. Shepherd, a Board-Certified pediatrician, is an earnest and effective advocate of the theory that Dr. Finley was negligent in making his diagnosis in that he failed properly to evaluate the child's over-

breathing which he called "a red flag," "the key" to everything. Dr. Shepherd testified that even without a history of aspirin ingestion the facts should have indicated to an examining physician that the child ought to be in an oxygen tent. I entertain the greatest respect for this physician's opinions but the history he had is hypothetical. I discount the factual assumptions on which his conclusions were based.

The case of *Johnson v. St. Paul Mercury Insurance Company et al.* (Ct. Appeal, La., 1969), 219 So.2d 524, has an uncanny resemblance to the Rewis case. There the parents awoke between 6:00 A.M. and 7:00 A.M. to find their two and one-half year old son playing in the kitchen with an open 100-tablet size bottle of adult aspirin. The tablets were scattered about the floor. There was no sign of ingestion from the father's examination of the child's mouth. The parents were not alarmed because the boy did not like aspirin. They went on to the Rice Festival leaving their son at the grandmother's house. On their return for him they were informed that he had vomited. He was also nauseated on the way home. That night the child could not sleep. At 1:30 A.M. (18 or more hours after the ingestion) he was nervous and had trouble breathing. The father took him to the hospital where aides took down the history, including, it was claimed by plaintiffs, the possibility of aspirin poisoning. One of the nurses instructed the father to inform the doctor of that fact. At the trial the parent testified that he did; the physician, that he did not. The defendant said that he specifically inquired as to the taking of aspirin or other medication and the father replied that the boy had *not*. On examination of the child he appeared lively and normal. His face was flushed and his throat a little red. The physician diagnosed the case as upper respiratory infection with laryngitis, that is, croup. The next morning the child's condition worsened and he breathed with difficulty. On his arrival at the hospital the boy was dead. The blood level was

25 milligrams percent of salicylate which is a toxic level.

I do not cite this case because of the result obtained, a finding of non-liability by the defendant, but as illustrative of the symptoms and the course that aspirin poisoning takes in the case of infants.

Dr. Rollings and Dr. Shepherd both testified that Dr. Finley's examination was inadequate. However, the former admitted that the existence of a history of access to aspirin would be of "the greatest importance in determining the procedure to be followed." In answer to the Government's hypothetical question, he replied, "If the facts are as you described them there could be no complaint about the physician's activity." I have not taken this statement into consideration since the hypothesis of facts submitted to him assumed that the child was "crying." However, it is not at all clear whether Dr. Rollings' response was materially influenced by that assumption as in the case of Dr. Shepherd.

Was Dr. Finley guilty of malpractice?

This is a question that could go either way but I find that, in the totality of circumstances, he was not negligent in examining Joann Rewis and concluding she had a viral disease rather than that the symptoms indicated aspirin poisoning. I find that no malpractice is involved in the examination, diagnosis or making of additional tests. There is no reason to disbelieve Dr. Finley's testimony concerning the non-history of aspirin ingestion. Absence thereof is strongly indicated by the testimony of Dr. Ageloff which I credit.

Dr. Shepherd and Dr. Rollings testified that if the rapid breathing in the physician's opinion was due to "nothing more than excitation," his answer might be different and that such would be a matter of medical judgment. Dr. Rollings was of the opinion that interpretation of overbreathing depended upon the rate and depth of respiration. In my opinion, the degree of hyperventilation indicating salicylate poisoning was not present when Dr. Finley made the examination.

In its opinion the Fifth Circuit suggested: "In another trial perhaps the expert testimony can shed clearer light on whether it is possible for an infant of this age to be beyond a reasonable probability of salvation by medical help but at the same time display no objective and discernible symptoms as would disclose to the examining physician, or even alert him, to the existence of the condition." This seeming anomaly was explained by Dr. Done. He said that six and one-half hours after ingesting aspirin a child could exhibit symptoms not sufficiently suggestive of poisoning to warrant such a diagnosis in the absence of a history of exposure. Relevant to this matter are the charts Dr. Done developed which are reproduced in the article cited in footnote 2, *supra,* concerning symptoms as related to hours since ingestion and the milligram percentage of salicylate in the blood. He testified that the curves had not changed since 1960 as a result of over one hundred additional case studies made since the publication of his article.

In view of my finding as to adherence to prevailing medical standards by Dr. Finley, it is not necessary to decide whether the Rewis child would have died irrespective of a proper diagnosis by the Army physician. The answer to the question of proximate cause presupposes that the baby would have been removed without delay to San Antonio where an artificial kidney was available. Of course, no one knows whether the life of a child who has taken a very large amount of aspirin would have been saved by such measures had there been an early correct diagnosis and a prompt air evacuation to Texas. Dr. Ageloff thought that use of the artificial kidney possibly would have saved the child but that the odds were against survival and he himself had little hope. Dr. Done said that there was a medical possibility that the child might have lived if an artificial kidney had been available although the high salicylate level in the blood was

generally incompatible with life. Dr. Portman testified that it was impossible to say whether the child could have been saved. Dr. Shepherd would not say that her life could have been preserved but he thought there was a probability. Dr. Rollings and Dr. Collins both testified that the salicylate level was highly lethal.

But as stated above I am not required to make a finding as to whether defendant's alleged negligence proximately caused the child's death.

Judgment will be entered for the defendant in accordance with this order.