503 F.2d 1202
 Mrs. Annie Laurie REWIS, as Temporary Administratrix of the
Estate of Jo-Ann Rewis, Deceased, and Mrs. Annie
Laurie Rewis and Joseph Sidney Rewis,
Individually, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 73-2340.
 United States Court of Appeals, Fifth Circuit.
 Nov. 18, 1974, Rehearing Denied Jan. 27, 1975, See 506 F.2d
1386.
 
 Joseph B. Bergen, Savannah, Ga., for plaintiffs-appellants.
 R. Jackson B. Smith, Jr., U.S. Atty., Henry L. Whisenhunt, Jr., Asst. U.S. Atty., Augusta, Ga., Tom Young, Atty. U.S. Dept. of Justice, Civil Div.-Tort Section, Washington, D.C., for defendant-Appellee.
 Before BROWN, Chief Judge, and TUTTLE and SIMPSON, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 This is the third appeal of this case to this Court. It is a Federal Tort Claims Act suit brought under 28 U.S.C.A. 1346(b), 2671-2680. The action is brought by the parents of their fifteen months old child, JoAnn Rewis, both in their representative and individual capacities. The gist of the action is the failure of the Medical Officer of the Day at Walker Air Force Base, New Mexico to diagnose and treat the child for aspirin poisoning from which she later died. The undisputed facts are: at a time estimated to be 3:30 p.m., September 4, 1963, while her mother was ill, JoAnn swallowed an unknown quantity of adult aspirin. Without knowledge of this fact, Sergeant Rewis took his wife to the base hospital at about dinner time, leaving the children with a neighbor who gave them their meal. Upon Sergeant Rewis' return home he was told that JoAnn had eaten her supper, but then immediately after that she started vomiting severely and had a very bad case of diarrhea. He also saw that 'she was blue around the eyes and lips' and he noted her 'deep breathing.' He then took her to the Air Force hospital, a distance of about ten miles, where after some delay, he saw the same doctor at 10:00 p.m. who had treated Mrs. Rewis. The doctor noted the symptoms except for the 'blueness' and made an entry to the effect that the child was 'hyperventilating'; her temperature was normal; he made an inspection of her throat, ears and chest, but took no chemical tests. In light of the fact that the child's mother had been found previously to have a viral infection, the doctor diagnosed the child's condition as a viral infection. He thereupon prescribed a 'decongestant, actified, one teaspoon four times a day, children's aspirin, and one baby aspirin every four to six hours a dose, which was one and a quarter grain tablet, liquid diet, a cough syrup, benedryl expectorant cough syrup, one teaspoonful four times a day, and Coca Cola syrup for the nausea, one teaspoon as often as needed.' The father then took the child home and administered the dosages prescribed during the night, during which the child was extremely restless and crying. He took the child back to the base hospital the next morning where, after some delay, JoAnn was seen by a doctor who immediately called a pediatrician, who thereafter took a blood sample which showed a blood salicylate level of 87.5 miligrams percent. After this discovery was reported to the pediatrician he set in force heroic measures in an effort to save the child, including a transfer by aircraft to San Antonio, Texas, where it was hoped that the presence of an artificial kidney might save her life. The discovery of the salicylate poisoning was too late to save the child and she died at approximately 7:00 on the evening of September 5, after having been taken from the plane in a moribund condition.
 
 
 2
 Plaintiffs charge that the failure to diagnose the salicylate poisoning at the time of the first examination at approximately 10:00 p.m. on September 4 was negligent and the direct cause of the death of the child.
 
 
 3
 The United States defended on the double ground that the conduct of the Medical Officer of the Day on the evening of September 4 fully comported with proper medical practice for the time and place involved and that, moreover, the ingestion of the aspirin was of such a large amount as would have been fatal in any event, so that even had there been negligent conduct by the doctor, there was a lack of legal causation of the death.
 
 
 4
 On the first two appeals to this Court we dealt with the problems of negligence, first concluding in Rewis v. United States 369 F.2d 595, that the trial court erred in receiving in evidence answers to hypothetical questions which were based on assumed facts which had not been proved in the record, and in the second, that on the proof developed on the trial in the form of expert testimony the trial court's conclusion that there was no negligence was clearly erroneous, and that in fact the Medical Officer of the Day was negligent in failing to diagnose and treat little JoAnn Rewis for the illness from which she subsequently died. Rewis v. United States, 5 Cir., 445 F.2d 1303. As pointed out in the second decision, since the trial court had not reached the question of causation at the trial level because of its finding that there was no negligence, the case was remanded to the district court for further proceedings, which all parties understood to mean a hearing and determination of the question of causation.
 
 
 5
 Because this is a non-jury case, and the trial court is the fact finder, it is of course essential that we ascertain from the statement, findings of fact and conclusions of law that the trial court applied the proper legal standard to the evidence dealing with the issue of causation. While it is not at all clear that the trial court did not have the proper standard before it, one statement contained in the first conclusion of law gives us concern lest too strict a standard may inadvertently have been applied to the proof of the plaintiff in this case.
 
 
 6
 The court stated, concerning the standard or burden of proof of causation: 'This burden was formulated by the Court of Appeals for the Fifth Circuit as a requirement that the plaintiff prove to a reasonable degree of medical certainty that this child's life could have been saved if Dr. Finley had correctly diagnosed her condition on September 4, 1963. Rewis v. United States, 369 F.2d 595, 599 (5th Cir. 1966). To show that the patient could be saved, the plaintiff need not exclude every possible hypothesis that the child would have died, but need only establish by a fair preponderance of the evidence the reasonable medical probability that it would not have died. Rewis, 369 F.2d 603.'
 
 
 7
 In this Rewis opinion we correctly stated the standard. 'The Court, upon the record as a whole, including the testimony of all the witnesses bearing on the subject, is, as the fact finder, required to determine for itself whether a proper diagnosis and treatment on the evening of September 23 would likely have prevented the loss of this life. See Sentilles v. Inter-Carribbean Shipping Corp., 361 U.S. 107 (80 S.Ct. 173, 4 L.Ed.2d 142).' We then pointed out that on this record in the Rewis case the trial court might have found more than a 'likelihood'; that it might even find causation 'to a reasonable degree of medical certainty'. It is unfortunate that this dictum was added, but it did not change the standard for proving causation from 'likelihood' of survival to 'one of reasonable degree of medical certainty'.
 
 
 8
 In any event, we emphasize that in an action for damages resulting from negligence in performance of health services there is no requirement 'that the plaintiff prove to a reasonable degree of medical certainty that this child's life could have been saved', but for the negligent conduct of the physician.
 
 
 9
 Under the laws of New Mexico which control here, the burden rests upon the plaintiff 'to introduce evidence to remove the cause from the realm of speculation and to give it a solid foundation upon facts.' Sanders v. Atchison, Topeka and Santa Fe Railway Co., 65 N.M. 286, 336 P.2d 324 (1959).
 
 
 10
 The trial court concluded that 'the plaintiffs have not carried the burden imposed on them. This Court finds that six hours after ingestion it is more probable that JoAnn would have died than that she could have been saved.'[1]
 
 
 11
 Because we conclude that the government expert witnesses based their opinions on unproved assumptions and on statements of fact in conflict with their own documentary evidence, both with respect to the salicylate level that should be used in estimating the peak level in JoAnn's system and because of the fact that the misdiagnosis prevented the initiation of even conservative methods of reducing the salicylate content of the blood, all of which were readily available to the physician, we conclude that the judgment for the United States cannot stand. Moreover, because, as found by the trial court itself, there was competent expert testimony that 'if the diagnosis was properly made and certain procedures were followed, I would think that the child could be saved', we conclude that the judgment must once again be reversed, this time for the entry of a judgment finding causation of death from the misdiagnosis and failure to treat the Rewis child.
 
 
 12
 In a unique sense the government's case here depended almost totally on a highly qualified pediatrician who had specialized in the diagnosis and treatment of poisoning, the author of a great many articles, thirteen of which were solely on the subject of salicylate poisoning, Dr. Allen K. Done. Because of the use on the third trial of all of the testimony presented on the two earlier trials, it has not been easy to pinpoint the fatal error in the disposition of this case. However, it is clear that the error arises because of the failure of the trial court to relate the basis of the expert testimony to the hypothesis on which it was based. What must be borne in mind is the fact that the failure of the Medical Officer of the Day on the night of September 4 to diagnose JoAnn Rewis' illness as aspirin poisoning, meant that nothing was done, either then, or for more than twelve hours thereafter, to eliminate the salicylate either from the stomach and other organs of the child or from her blood into which it was later absorbed.
 
 
 13
 Dr. Done's opinion that JoAnn would have been unlikely to survive was bolstered by his presentation of a curve or graph which, as he explained to the Court, enables one skilled in the art who has ascertained the salicylate level in the blood by the simple taking of a blood sample at a known time following ingestion to compute 'a rough guide' to the peak level in a patient following ingestion and absorption into the blood. This chart showed that when the blood sample was taken from JoAnn Rewis between 11 and 12 o'clock on September 5 the salicylate level was 87.5 miligrams percent. By using the equation, which neither appellant nor we fault when used for the purpose for which it was designed, (primarily diagnostic purposes, according to Dr. Done) this would indicate that the peak level of concentration in JoAnn was somewhat over 160 miligrams percent.[2] The trial court concluded that it made no difference whether the peak was 160 miligrams percent or 200 miligrams percent. This may well have been due to the trial court's accepting Dr. Done's statement at one place in his testimony that at a level of 160 miligrams percent 'In our experience they all died.' This testimony is belied by other testimony by Dr. Done and completely disproved by his own graph showing numerous survivals at or above the 160 level where conservative treatment was used.
 
 
 14
 While some of the uses to which the chart were put were criticized by appellants,[3] and although we agree that it was potentially seriously prejudicial to the appellants for the time of the taking of the blood sample to be misstated by some two and a half hours,[4] we conclude that it is not necessary to rule out the use of the chart completely to arrive at a conclusion that the use of it does not support Dr. Done's testimony. Without it, there is no proof of what the peak level of salicylate would have been had even conservative treatment been commenced immediately. It must be borne in mind that there is no proof as to what amount of aspirin was eaten at 3:30, and no attention was paid by any witness to the subsequent ingestion of children's aspirin upon the doctor's prescription late at night.
 
 
 15
 One troublesome factor of this case is that a study prepared by Dr. Done based upon what he had determined to be the average length of time it takes for aspirin taken at a single dose (a point on which there is no proof in this record) to be totally absorbed into the blood stream was used here as proof that the presence of 87.5 miligrams percent salicylate at a certain time equalled proof of a peak level in excess of 160 miligrams percent; this, even though the graph prepared by Dr. Done made certain assumptions which he himself suggested were either based on averages or were arbitrarily chosen. For instance, he stated that the graph was made on the assumption that the peak was arrived at six hours after ingestion, although he stated that it sometimes takes as long as eight to ten hours. He also stated 'It depends on many factors including whether the stomach is full or empty' and in response to the question 'And sometimes you say, the peak level is reached early or sometimes later. It is just impossible to say in any given human being?' He answered 'It is impossible to say except within very broad limits.' Thus it is that, since no one knew how much aspirin JoAnn had eaten, and no tests were made when she went to the doctor on the evening of September 4, the only proof as to the 'fact' that she had consumed enough aspirin to make her survival unlikely even with proper treatment, promptly taken, is the result of the blood test taken shortly before noon the following day.
 
 
 16
 Dr. Done plotted the point representing 87.5 miligrams percent on his chart or nomogram at a point representing a time between twenty-two and twenty-three hours after ingestion.[5] Then by plotting a logarithmic curve (here a straight line) through this point he concluded that the peak level had been approximately 200 miligrams percent. The nomogram cannot be adequately understood without reproduction. It is therefore attached as Appendix I.[6] It lines indicate the rate of regression was devised by Dr. Done to assist a physician dealing with a child the amount of whose intake of aspirin was unknown, but who was shown at a known time after ingestion to have salicylate poisoning, to approximate the peak level by taking a blood sample. The diagonal descending lines indicate therate of regression from the peak level that Dr. Done's studies 'approximately' indicated would 'likely' occur through normal body processes.
 
 
 17
 The burden of Dr. Done's testimony, which was borne out by the other expert witnesses who relied on his studies was to the effect that if the peak level of salicylate exceeded 160 miligrams percent a person suffering from this condition would be more likely to expire than to survive.
 
 
 18
 Now we come to the critical defect in the government's case. The difficulty here is that Dr. Done made it abundantly clear that his testimony was based upon the assumption that the peak level of salicylate in the child's blood was 160 miligrams percent or over. But this assumption was never put to the witness as a proven fact as a part of the hypothesis upon which his opinions were based. The only assumption which was proved with respect to the salicylate level was that at some point between nineteen and twenty-three hours after ingestion there was a level of 87.5 miligrams percent. Based on this proven fact, the witness then drew on his own experience and research and study to do some hypothesizing of his own. Government counsel asked Dr. Done 'Doctor, in terms of your opinion, what is the significance of the positioning of the Rewis child on your chart?'[7] Dr. Done answered 'Well, if one accepts the stated interval since ingestion and assumes that the blood level salicylate was correct, it places her clearly within the range where fatal outcome is really to be expected. It also places her in an area where, the medical probability is that a fatal outcome would ensue.'
 
 
 19
 In addition to the fact that 'the stated interval since ingestion' cannot be accepted for the purpose of his answer, it is also clear that the answer is based upon further assumptions as to the correctness of the blood level salicylate, which means that the graph could be used as proof of the fact that with the 87.5 figure known at a definite time an accurate reading could be made to prove what JoAnn Rewis' peak level had been at the critical point, here contended by the government to be at or above the 160 miligrams percent mark.
 
 
 20
 We need only look to Dr. Done's own explanation of his nomogram and his testimony at the trial to conclude that the Court could not accept his second assumption any better than it could accept the first. Dr. Done testified, as of course he would have to, that he did not know what the peak level was in JoAnn's case. He undertook to substitute this lack of knowledge by a graph which, as Dr. Done testified, was only a disagnostic aid.[8] When questioned by counsel for appellants as to the entries on the chart, including entries indicating what had happened to other patients suffering from aspirin poisoning, Dr. Done conceded that the chart was 'minimal in terms of correctness.' This frank answer was to be expected in view of the fact that the assumption that the chart was correct for the purpose of fixing JoAnn's peak level at 160 miligrams percent was based on several other assumptions. The first was that the aspirin was ingested in a single dose, whereas we know that at least to the extent that she ingested aspirin after the doctor's examination at 10:00 p.m., this assumption is not true. Furthermore, there is, of course, no proof as to the actual method or sequence of events when JoAnn ate the aspirin. The second assumption which is made in the use of the monogram is that the aspirin had been fully absorbed into the blood stream in six hours. Of course we know this is not true, because JoAnn took additional children's aspirin after six hours from the first ingestion. Moreover, no such assumption can be made because Dr. Done testified, and his article bore out the statement, that the rate of absorption was affected by the condition of the particular patient, by the kind of aspirin, by the extent to which it may have impacted in the stomach or may have been flaky and easily absorbed and although Dr. Done testified that the time of absorption might be as long as eight to ten hours and that such time could not be stated 'except within very broad limits.' The third assumption is that the rate of regression (elimination from the blood) during the hours up to the taking of the blood test the next day was 'average'. There was no basis for Dr. Done's determining, and he made no effort to testify to the effect, that JoAnn's rate of regression was average.
 
 
 21
 Thus, we do not have an expert witness testifying in response to a hypothetical question in which he is asked his opinion as to the likelihood of survival of a child in whom it has been determined that there was a peak salicylate level of 160 miligrams percent or higher. He was asked about a child whose salicylate level at a stated time following ingestion was 87.5 miligrams percent, and he thereupon assumed several unproven facts to arrive at the conclusion that she had a peak level of 160 miligrams and that above this figure death was more likely to occur than not.
 
 
 22
 As we stated in Rewis I 'Of course, in order for the opinion to have any value it must be based on assumptions which the trier of the facts can find to have been proved. See United States v. Cooper, 5 Cir., 277 F.2d 857; International Paper Company v. United States, 5. Cir., 227 F.2d 201.' Here there was no opportunity for the trial court to make a finding that JoAnn's peak level was equal to or above 160 miligrams percent. Dr. Done was not even asked whether he had a sufficient basis to form an opinion as to her actual peak level. He did testify that he could not state what it was. Of course Dr. Done did not see the child.[9] His testimony was based entirely upon assumed facts and since, as we have said in the cases already cited that an expert opinion is no better than the hypotheses upon which it is based, we must conclude that Dr. Done's opinion cannot be considered as a basis for the trial court's judgment.
 
 
 23
 It is apparent that Dr. Finley, the Medical Officer of the Day, and Dr. Ageloff, the pediatrician who first learned of the 87.5 miligrams percent blood level the following day, based their opinions as to causation equally upon Dr. Done's logarithmic chart. Each of them discussed the finding of 87.5 miligrams percent as the basis for his conclusion that no treatment would have been likely to have saved the child. We conclude, therefore, that their opinions as to causation cannot be relied upon to support the trial court's judgment.
 
 
 24
 On behalf of the plaintiffs, Dr. Shepherd testified to a number of measures that should immediately be taken upon the ascertainment of aspirin poisoning. He testified as to the importance of the same conservative means described by Dr. Done in his articles. He included in his recitation also the use of exchange transfusion or the use of the artificial kidney for dialysis, mentioning the artificial kidney of course only in a situation where it was available. He then stated 'All of these are measures that can be taken and if done early and expeditiously there is every reason to believe that you will succeed in the salvaging of this child, saving this child.' After being queried by government counsel as to the degree of severity represented by a salicylate level of 87.5 miligrams percent nineteen and a half hours after ingestion he agreed that this would be considered 'a very severe case.' He was then asked 'However, if this had been done, this blood exchange, at six hours?' He answered 'That's an entirely different question. The probability would be far greater for the salvage of life.'
 
 
 25
 Because of the fact that this case has been tried three times, and depositions were also taken, it is not easy to winnow out the hypotheses on which each question was presented to the experts. Nevertheless, we have attempted carefully to analyze the real basis attributed by each expert witness for the opinion given by him. We conclude without any hesitation that Dr. Shepherd's opinion was based on facts proven in the record. We are equally certain that the opinions of the three government experts were based on assumptions that were not so proven.
 
 
 26
 However, because of our reluctance as an appellate court to reverse findings of fact by the trial court, we think it appropriate to discuss a further feature of the case as it was presented. It is plain that all of the doctors testifying agreed that if there had been a proper diagnosis made at 10:00 on September 4 some immediate measures would have been undertaken. Efforts would have been made to remove the remaining amounts of aspirin that had not yet been absorbed, and of course no additional aspirin would have been prescribed. Other measures would have followed immediately to hasten the removal of the salicylate from the blood after absorption. From the testimony by the government's witness, Dr. Done, some of these measures would have caused a rapid decrease in the level.
 
 
 27
 For some unknown reason, at one point in his testimony as to the patients appearing above the 160 miligrams percent line, Dr. Done said 'This is the line above which fatalities are likely to occur . . . In our experience they all died.' A most casual glance at this nomogram proves this to be demonstrably incorrect. There are several on or above the 160 miligrams line, who received only conservative treatment, and who survived.[10] A more significant thing, however, is that clustered just at or below the 160 miligrams percent line there is an even larger number, thus emphasizing the importance of what has been said before to the effect that had the doctor in charge made the examination and given the treatment which proper medical practice would have required, it appears almost as a matter of course that this patient would have fallen among this large grouping under the 160 line, all but one of whom survived.
 
 
 28
 What we have just said has even greater significance in pointing out why it is essential that the court scrutinize as we have the basic assumptions that JoAnn's peak level was 160 miligrams percent. If, because she did not fit into the neat pattern of those (1) whose absorption was completed in precisely six hours, (2) that the ingestion of aspirin was all in one dose, (3) that she was normal with respect to the matter of absorption and (4) average with respect to the degree of regression, there is at least an equal chance that she would have fallen below the line indicated, in which event she would have shown up on the chart as one patient who survived.
 
 
 29
 We do not reach the question, much discussed by the trial court, as to the relative efficiency of treatment by exchange transfusion and dialysis by use of an artificial kidney back in 1963. It is perfectly clear that Dr. Done gave his opinion with respect to the likelihood of JoAnn's survival based on the assumption, included in the government's hypothetical question, that no kidney machine was available. On one occasion he himself suggested that the hypothesis be inserted in the question put to him by counsel.
 
 
 30
 Then, however, Dr. Done expressed the opinion that, although the process of exchange transfusion was readily available at Walker Air Force Base and although if undertaken it would rapidly reduce the salicylate level, it would have been medical negligence to have undertaken an exchange transfusion, if an artificial kidney was available. The trial court also felt it appropriate to quote from this testimony which, we consider to be totally without value in view of the fact that no artificial kidney was available. The court's recitation of Dr. Done's statement 'That anyone who had access to hemodialysis would, in his view, be foolish to resort to exchange transfusion because it would simply delay the more effective procedure', thus turns out to be meaningless, because the Rewis child did not have access to hemodialysis.
 
 
 31
 The witness's final opinion, that either with or without a kidney machine he was of the view that JoAnn would have been more likely to have expired than to have survived, makes unnecessary any comparison as to the effectiveness of such treatment. Since, however, this opinion was based upon assumptions not in the record, as we have pointed out above, the opinion is no aid to the government in meeting the prima facie case made by the plaintiffs.
 
 
 32
 Finally, we think it appropriate to add that Dr. Done's testimony and his articles, freely drawn from in the discussion of his testimony in open court, clearly and plainly expressed the view that upon diagnosis of salicylate poisoning something should be done immediately to ameliorate the condition. Since it was misdiagnosis of the government doctor which resulted in a failure to take any of these steps and caused the administration of additional aspirin it seems a heavy burden, indeed, to require a plaintiff to prove that if the doctor had done what proper medical practice would require it is more likely than not that the child's life would have been saved. This, however, as we have noted, is the burden. We conclude that the testimony of Dr. Shepherd, supported as it is in some material respects by Dr. Done, clearly made a prima facie case of causation under the requisite standard of proof. It is equally clear that when the government's expert opinions on causation are disregarded, because they are unsupported by a proper hypothesis, plaintiffs' proof stands unrebutted. This, therefore, required a finding by the trial court in favor of the plaintiffs.
 
 
 33
 The judgment for the defendant is reversed and the case is remanded to the trial court to enter a judgment for the plaintiffs for such amount as determined by the court.
 
 
 34
 (Appendix 1 omitted)APPENDIX A
 
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 35
 This action having been tried upon the facts by the Court without a jury, the Court does hereby find the facts and states separately its conclusions of law thereon, and directs the entry of the appropriate judgment, as follows:
 
 STATEMENT OF THE CASE
 
 36
 (1)
 
 
 37
 Sometime during the afternoon of September 4, 1963, fifteen-month-old Joann Rewis ingested what proved to be a fatal dose of aspirin. Her father, a Sergeant in the Air Force, had discovered that she had been playing with a bottle which once contained 300 adult aspirin tablets but neither parent sought medical assistance at that time. Instead, the parents waited until 6 hours later when the child had become ill. Joann's father then took her to the Walker Air Force Base Hospital where Dr. Robert Finley misdiagnosed her condition as a viral infection of the respiratory tract. At no point during the examination did Sergeant Rewis suggest that Joann might have ingested any aspirin even though Dr. Finley specifically asked him whether she had taken any medicine. See Rewis v. United States, 369 F.2d 595 (5th Cir., 1966). The child was sent home with her father but because her symptoms became more severe the Sergeant returned her to the hospital on the next morning. There he again remained silent about the possible aspirin poisoning until Dr. Andrew Ageloff recognized the now advanced symptoms and ordered a blood test to determine the blood salicylate level. At that point the Sergeant remembered that Joann had been playing with an aspirin bottle. p. 449. The blood test, taken approximately 22 hours after ingestion, revealed a salicylate level of 87.5 milligrams per cubic centimeter of blood. This was so high that it was decided that only an artificial kidney offered any hope of survival. The nearest available one was in San Antonio, Texas, and at about 3:00 p.m. Joann was placed on an aircraft to take her there. During the flight her vital functions began to fail, forcing the plane to land in Big Springs, Texas, where doctors were unable to revive the child.
 
 
 38
 (2)
 
 
 39
 The plaintiffs in the case are the child's parents, individually and her mother as the temporary administratrix of the daughter's estate. The parents claim the loss of services of the child and the administratrix seeks recovery for the value of Joann's life. The plaintiffs based jurisdiction under the Federal Tort Claims Act, 28 U.S.C. 1346(b), 2671-2680. They contend that the Government employee, Dr. Finley, negligently failed to diagnose the aspirin poisoning, thereby proximately causing her death.
 
 
 40
 (3)
 
 
 41
 This is the third time this Court has considered these claims. The case was first tried before Judge Scarlett in the Spring of 1965. His finding for the Government was appealed and reversed by the Court of Appeals for the Fifth Circuit. Rewis v. United States, 369 F.2d 595 (5th Cir., 1966). The appellate court felt the court had improperly applied a prior decision in Watson v. United States, 346 F.2d 52 (5th Cir., 1965) by requiring specific expert testimony that, to a reasonable degree of medical certainty, the child's life could have been saved if Dr. Finley had initially diagnosed the aspirin poisoning. The Court of Appeals believed that even without such a statement the record, as it stood, might well have supported a finding that the child would have been saved. Furthermore, the Court of Appeals ruled that several expert opinions, which may have influenced the finding that Dr. Finley was not negligent, were based upon the unsupported assumption that the child was either crying vigorously or breathing normally. As a result the case was remanded for additional consideration of these issues.
 
 
 42
 (4)
 
 
 43
 The case was retried in 1969 under a stipulation that all testimony given at the first trial, except the deposition of Dr. A. L. Ageloff, would be considered as though it had been given at the second trial. In addition, this Court heard expert testimony on the questions of causation and negligence. The Court reaffirmed its determination that Dr. Finley was not negligent in diagnosing Joann's ailment as a viral infection and, therefore, did not reach the question whether the child could have been saved had the aspirin poisoning been diagnosed.
 
 
 44
 (5)
 
 
 45
 This decision was also appealed. Again the Court of Appeals for the Fifth Circuit reversed, finding that Dr. Finley was negligent in diagnosing the child's condition as a viral infection. Because there had been no finding on the issues of causation and other relevant issues the Court of Appeals remanded the case for further findings upon all issues raised by the pleadings and the evidence.[11] See Rewis v. United States, 445 F.2d 1303.
 
 
 46
 (6)
 
 
 47
 In view of these instructions the trial record was reopened to include additional expert testimony on causation.
 
 
 48
 At this point it will be useful to recapitulate the medical testimony bearing upon the question of probability of death irrespective of the erroneous diagnosis.
 
 
 49
 Dr. Edwin C. Shepherd, a highly competent Savannah pediatrician, discussed such measures as intravenous bicarbonate treatment, peritoneal dialysis (flushing the stomach), exchange transfusion of blood and the use of an artificial kidney. He testified that bicarbonate treatment could possibly be effective to save life in severe cases and that an exchange transfusion was considered by many to be as effective as the use of an artificial kidney and by some, more effective. Record, pp. 615-619. He was of the opinion that if 'the diagnosis was properly made and certain procedures were following I would think that the child could be saved.' p. 613. He was of the opinion that if the measures mentioned had been 'done early and expeditiously there is every reason to believe that you will succeed in the salvaging of this child, saving this child.' p. 614. Dr. shepherd stated that the probability of salvage of life would be far greater as the result of blood exchange if it had been resorted to six hours after ingestion rather than at 19.5 hours. p. 619.
 
 
 50
 Dr. Harry E. Rollings of Savannah, a specialist in internal medicine, testified that a salicylate level of 87.5 mg% Would be a 'highly lethal dose.' p. 76.
 
 
 51
 Dr. Andrew L. Ageloff, who was Base Pediatrician at Walker A. F. B., New Mexico, testified that after receiving the report of 87.5 mg% Blood salicylate level that it was his opinion that 'this child in order to survive, if she were able to survive, needed the benefit of an artificial kidney . . ..' He attempted to locate one in the immediate area but none was available. p. 440. He testified that an exchange transfusion of blood was not indicated and that that treatment is not well accepted and that 'its success is very, very limited.' p. 510. He further stated that it is the least satisfactory method of treating salicylate poisoning, and that the artificial kidney is well accepted as the most efficient method. Nor was peritoneal dialysis as practiced in 1963 effective in removing salicylate. Asked about eventualities had treatment been begun at 10:00 p.m. on September 4th, Dr. Ageloff testified that in the light of the treatment available at Roswell, New Mexico, 'I believe the child probably would have died anyway' and that the odds were more against than in favor of survival. p. 513.
 
 
 52
 Dr. Robert H. Finley who initially treated the child was questioned as to the probability of survival with a salicylate level of 87.5 mg%. He stated that he would have been unable to save the child; that such an amount of poison would be 'incompatible with life' and was recognized as a fatal level. p. 174. It was his impression that the child would have died although therapy would have gone on in the hope that 'this would have been one of the cases that could be saved.' p. 211.
 
 
 53
 Dr. Bernard M. Portman of Savannah, who is a pediatrician, testified that the medical probability that the child would not have been saved, had prompt measures been taken, depended on the salicylate level at that time. Eliminating statistics and curves, he said it was impossible to say that the child could not have been saved but that there is a level beyond which it could not have been at that stage. Excluding the use of Dr. Done's computation and with no symptomatology Dr. Portman said he would be unable to say that the child could be saved. 'I couldn't say either way.' pp. 604-607.
 
 
 54
 Like Dr. Shepherd, Dr. Allen K. Done is a certified member of the American Board of Pediatrics. He has specialized in the diagnosis and treatment of poisoning. He is an officer of the American Association of Poison Control Centers and was full Professor of Pediatrics and Professor of Clinical Toxicology at the University of Utah. In addition, he has served as the Director of the Inter Mountain Regional Force and Poison Control Center. At the time of the second trial he had published 92 articles, 13 of which were solely on the subject of salicylate poisoning. Finally, in addition to treating cases in the University Hospital, Dr. Done has independently researched the characteristics of salicylate poisoning.
 
 
 55
 Dr. Done testified that aspirin and other salicylates, unlike many other poisons which act directly, produce their toxicity by putting into motion certain metabolic abnormalities that take time to develop. He said that it is these metabolic derangements that are brought about in a case of aspirin poisoning that cause death or serious illness. p. 525. In Dr. Done's opinion the medical probability is that the child would not have survived even if treatment had been instituted at 10:00 p.m. on September 4th. p. 529. On the basis of his study and experience, he was of the opinion that the child would have died since the level was such which is 'in most patients, particularly children, incompatible with life, unless measures are taken such as the artificial kidney is used.' p. 530. In his opinion exchange transfusion is so inefficient compared with artificial kidney that anyone who had access to hemodialysis would, in his view, be foolish to resort to exchange transfusion because it would simply delay the more effective procedure. p. 569. Dr. Done thought that an exchange transfusion at 10:00 p.m. on September 4, 1963, when there was the capability of flying the child to a place where an artificial kidney was available would be negligence. p. 586. He testified that if there was a salicylate level of 87.5 mg% About noon on September 5th that the level calculated back to the time of ingestion would be 164 mg%. pp. 555-556. Asked whether at an ingestion level of 160 mg% Fatalities are likely to occur, Dr. Done replied, 'In our experience they all died.' p. 589. He said that even if the child were still alive at the time an artificial kidney became available an additional two hours (or even much later) would be necessary to get it in operation and that such preparation could not be made while the patient was enroute. p. 587; 3-- p. 45, Tr. 1/7/72.
 
 
 56
 At the January, 1972, hearing Dr. Done testified that since his first appearance in the case the opinion then expressed by him could then be substantiated even more strongly than in 1969. He said that it could not be substantiated that 'this child would have survived had the diagnosis been made at that earlier time.' 3-- p. 10, Tr. 1/7/72. Dr. Done further testified that it was, of course, possible that Joann could have been saved but that he did not believe it was probable. 3-- pp. 48-49.
 
 FINDINGS OF FACT
 
 57
 (1)
 
 
 58
 The Government submitted Proposed Findings of Fact and Conclusions of Law on October 10, 1972.[12] The plaintiff had submitted findings in 1969 which covered both the malpractice and the causation issue. I have long debated and mulled over the solution of the difficult factual issue presented to the Court in this case.
 
 
 59
 There is no question but that we are largely dealing with conjecture, surmise and imponderables. We must rely on the view of experts. The choice of ultimate fact is not an easy one.
 
 
 60
 No one knows whether Joann Rewis could have been saved if the aspirin poisoning had been properly diagnosed. However, it is possible to determine the probability of survival given the concentration of salicylate in the blood at a known time after ingestion and given the types of treatment available.
 
 
 61
 (2)
 
 
 62
 When Dr. Shepherd was asked whether the child probably could have been saved, he replied, as already stated, 'if the diagnosis was properly made and certain procedures were followed, I would think that the child could be saved.' p. 613. On cross-examination, Dr. Shepherd stated that these procedures should be done 'early and expeditiously.' p. 614. He conceded that some of them would not have been useful. The most conservative treatment is the administration of bicarbonates so as to accelerate the rate of discharge of the salicylate. However, this is not very effective and, in his opinion, offered no more than a 'possibility' of survival. p. 615. Peritoneal dialysis is a second option but in 1963 this was still an ineffective measure because it had not yet been combined with the administration of human albumin. (Ageloff, p. 511; Done, p. 571; Shepherd, p. 616). Under the evidence, the only procedures which might offer significant probability of survival in such a case as this were exchange transfusions and hemodialysis (artificial kidney).
 
 
 63
 (3)
 
 
 64
 The record reflects substantial disagreement among the experts as to the comparative efficacy of exchange transfusions and hemodialysis. For example, Dr. Shepherd could not say which technique is preferred if both are available. p. 617. On the other hand, Dr. Ageloff believed hemodialysis is the most efficient way to remove salicylate from the blood (p. 510) and Dr. Done stated that an 'exchange transfusion is so inefficient by comparison with hemodialysis that anyone who had access to hemodialysis would, in my view, would be foolish to resort to exchange transfusions because it would simply delay the more effective procedure.' p. 569. This dichotomy in expert opinion is complicated by the fact that transportation to an artificial kidney and the initiating of hemodialysis would have involved several hours delay. As a result, some experts would perform an exchange transfusion in preference to or before moving a patient to an artificial kidney (Dr. Shepherd, pp. 617-618) while others feel the artificial kidney is so much more effective that no time should be wasted with transfusions. (Dr. Ageloff, p. 510; Dr. Done, p. 569).
 
 
 65
 On the basis of the expert testimony presented in this case, I find that hemodialysis is substantially more effective than an exchange transfusion and, therefore, more likely to have saved Joann's life had it been available in Roswell, New Mexico.
 
 
 66
 (4)
 
 
 67
 Since 1960 Dr. Done has studied and analyzed over 500 additional cases of aspirin poisoning in children. pp. 3-9, Tr. 1/7/72. Based on his researches, he prepared charts of salicylate levels as a function of time from ingestion. Although patients reach their maximum concentration of salicylate at different times he found that the concentration thereafter drops in a manner which depends on a constant. His studies and graphs show extrapolation from a blood salicylate level, S, at a known time after ingestion, t, to obtain a value, S(0), where log S(0) = log S k 0.015t. Plaintiff's Exhibit 1, Tr. 1/7/72. The S(0) factor permits comparison of cases on the same basis at the same point in time, namely at t = 0. This would not be possible if the maximum salicylate concentration were used because even if such maximum could be measured, similar maximums reached at different times represent different severities of aspirin poisoning. See p. 549. By calculating the S(0) value for a particular patient one can make a fairly accurate determination of the chances of survival based upon how many other patients survived with that or a higher S(0) value.
 
 
 68
 (5)
 
 
 69
 Because this technique compiles experience, one would expect the conclusion reached with it to be fairly consistent with what other expert witnesses concluded on the basis of their experience. That appears to be the case here. But, as several of the witnesses made apparent by their desire to rely on Dr. Done's article, this technique has the advantage of providing a much less subjective estimate of the chances of surviving with whatever treatment is available than would an opinion based on random experience. Using this research and the chart, Dr. Done concluded that the medical probability was that Joann could not have survived even if the aspirin poisoning had been diagnosed by Dr. Finley. 3-- p. 10. This would be the case regardless of whether the blood salicylate level was measured 18 1/4 or 22 hours after ingestion. pp. 529 and 3-- p. 31. It would be the case even if the best possible treatment had been sought immediately. 3-- pp. 36, 37, 43, 49, Tr. 1/7/72.
 
 
 70
 (6)
 
 
 71
 The time that elapses between ingestion and measurement of the blood salicylate level is critical as it determines the severity of the poisoning. The blood level was measured when Dr. Ageloff saw the child between noon and 1:00 p.m. on September 5, 1963. pp. 427 and 462. The testimony of the parents indicates that Sergeant Rewis discovered aspirin on the floor at some time between 3:00 p.m. (p. 37) and 3:30 p.m. (p. 234) on the preceding day. Mrs. Rewis testified that the house was in order shortly after 2:30 p.m. p.37. If one assumes that she checked the kitchen cabinet where the aspirin was kept or that she was sufficiently alert to observe aspirin on the floor, then the blood test must have been conducted between 21 and 22 hours after ingestion.
 
 
 72
 (7)
 
 
 73
 On the basis of the evidence in the record and reviewed above, I find that at the time Dr. Finley first examined Joann Rewis, it could not be said to a reasonable degree of medical certainty that she could be saved even by the best possible combination of treatment. In making this finding, I emphasize that while there is some chance of survival in almost every situation the probability of survival under the circumstances of this case was much less than the probability that the child would die.
 
 
 74
 (8)
 
 
 75
 Although it may not initially appear so, this finding is consistent with the relatively mild symptoms exhibited when Dr. Finley examined Joann. As several of the expert witnesses explained, aspirin does not destroy the body directly. Instead, it creates a chemical imbalance which makes it difficult to absorb sufficient oxygen. As a result, the maximum concentration of aspirin in the blood is reached long before the maximum body reaction. The symptoms develop more slowly and, therefore, do not fully reflect the severity of the poisoning until some time after the poison is absorbed. p. 525. Joann's condition at 10:00 p.m. on September 4th appeared relatively mild because there had not yet been time for the complete symptomatology to develop though she had already absorbed so much poison that it was improbable she could survive.
 
 CONCLUSIONS OF LAW
 
 76
 (1)
 
 
 77
 The controlling substantive law is that of New Mexico where the malpractice occurred. 28 U.S.C. 2674. New Mexico follows the general rule that the plaintiff must establish that the departure from recognized standards of medical practice was the proximate cause of the injuries. Schrib v. Seidenberg, 80 N.M. 573, 458 P.2d 825 (1969). This burden was formulated by the Court of Appeals for the Fifth Circuit as a requirement that the plaintiff prove to a reasonable degree of medical certainty that this child's life could have been saved if Dr. Finley had correctly diagnosed her condition on September 4, 1963. Rewis v. United States, 369 F.2d 595, 599 (5th Cir., 1966). To show that the patient could be saved, the plaintiff need not exclude every possible hypothesis that the child would have died but need only establish by a fair preponderance of the evidence the reasonable medical probability that it would not have died. Rewis, 369 F.2d 603.
 
 
 78
 The Supreme Court of New Mexico has held that in malpractice cases it is not sufficient to show that the negligence charged might reasonably have caused the injury, 'if the circumstances shown indicate an equal probability that it was due to some other cause.' See Buchanan v. Downing, 74 N.M. 423, 394 P.2d 269 (1964). To similar effect is the rule which is applied in New Mexico (it is the general rule) that where there are two possible causes, for only one of which a defendant is responsible, the plaintiff must show that the defendant's act or omission is the more probable. The application of the rule does not place upon the person injured the burden of excluding every possible cause of the accident for which the defendant would not be liable. The burden rests upon the plaintiff 'to introduce evidence to remove the cause from the realm of speculation and to give it a solid foundation upon facts.' Sanders v. Atchison, Topeka & Santa Fe Railway Company, 65 N.M. 286, 336 P.2d 324 (1959).
 
 
 79
 Plaintiffs have not carried the burden imposed on them. This Court finds that six hours after ingestion it is more probable that Joann would have died than that she could have been saved. I have concluded that failure to diagnose her condition on September 4, 1963, was not the proximate cause of her death. Therefore, there can be no recovery against the United States for the acts or omissions of Dr. Finley in diagnosing the symptoms. The cause of Joann's death was not faulty diagnosis or delay in proper treatment. It was the lethal dose of aspirin the child had consumed.
 
 
 80
 Judgment is entered accordingly.
 
 
 81
 This May 22, 1973.
 
 
 82
 (s) Alexander A. Lawrence
 
 
 83
 CHIEF JUDGE, UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF GEORGIA
 
 SIMPSON, Circuit Judge (dissenting):
 
 84
 Following the last remand of this case[1] the district judge made careful and complete findings of fact, amply supported by the record, adequate conclusions of law, correctly applying controlling precedent, and entered judgment thereon for the United States.[2]
 
 
 85
 The last appeal determined that negligence was proved and that the trial court was clearly erroneous in finding that the employee of the United States, Dr. Finley, was not negligent in his examination and diagnosis of the Rewis's fifteen months old daughter, Joann Rewis. Since the trial judge had found no negligence was present, the direction on remand was that he make findings 'on the issue of causation and other relevant issues.'
 
 
 86
 The district judge took additional evidence as to causation and as noted, made full and complete findings, concluding:
 
 
 87
 'Plaintiffs have not carried the burden imposed on them. This Court finds that six hours after ingestion it is more probable that Joann would have died than that she could have been saved. I have concluded that failure to diagnose her condition on September 4, 1963, was not the proximate cause of her death. Therefore, there can be no recovery against the United States for the acts or omissions of Dr. Finley in diagnosing the symptoms. The cause of Joann's death was not faulty diagnosis or delay in proper treatment. It was the lethal dose of aspirin the child had consumed. Judgment is entered accordingly.'
 
 
 88
 This, I respectfully submit, is where this difficult and protracted lawsuit should come to permanent rest.[3] Inshead the Court undertakes to reverse the trial court on this crucial and strongly controverted factual issue, despite ample evidence in the record supporting the decision of that court.
 
 
 89
 I do not so understand our appellate function under the constrictions of the 'clearly erroneous' standard of Rule 52(a), F.R.Civ.P. and the numerous cases decided by this and other courts interpreting the rule. Fact-finding is the business of the trial court. I cannot accede to usurpation of that role by this court.
 
 
 90
 Further dissertation in this dissent would be a work of supererogation. The district court memorandum opinion, attached as Appendix A illustrates my point with clarity and telling precision.
 
 
 91
 With deference, I dissent.
 
 
 
 [1]
 This ultimate finding is based on a correct formulation of the standard of causation, as discussed above. We construe the finding as meaning that the court finds that, had proper diagnosis and treatment been started six hours after ingestion, it is more probable that JoAnn would have died than that she could have been saved. That is clearly the import of the court's other findings and conclusions
 
 
 [2]
 In point of fact the graph presented by Dr. Done assumed that the blood sample had been taken between twenty-two and twenty-three hours after ingestion. As we read the record, we conclude that the entire case was tried on the assumption that JoAnn ate the aspirin at approximately 3:30 in the afternoon. It is clear from the government's witnesses that the blood was taken from JoAnn before she was admitted to the hospital, shown at one time to be 11:50 and at another to be 12:00. Moreover, the hypothetical question put to Dr. Done by government counsel stated the child's blood salicylate level 'was subsequently determined to be 87.5 miligrams percent at about nineteen to twenty hours after ingestion.' By using the figure from twenty-two to twenty-three hours, rather than the correct figure of nineteen to twenty hours the graph showed that the peak level of salicylate in JoAnn's blood was 200 miligrams percent. The graph thus seriously misrepresented the most important fact which formed the basis of all the experts' opinions. The mistake is understandable, though none the less harmful to the appellants. The author of this chart may have taken the time the laboratory report was given rather than the time when the blood was taken from the child
 
 
 [3]
 On the chart introduced in evidence the line 160 miligrams percent was marked 'Lethal'. Such an expression of opinion on the chart is, of course, improper. Incidentally, in his 1960 article, later referred to, Dr. Done called this line 'Severe'
 
 
 [4]
 The importance of this will be seen when it is understood that the graph represented studies which undertook to show the peak level because the rate of regression or dispersal of the salicylate from the blood was at a known rate. In other words the salicylate level would descend at a constant rate from the peak, so that if a figure of 87.5 miligrams percent were shown at twenty-two to twenty-three hours after ingestion it would of course indicate a much higher peak than if it were shown at nineteen and a half hours after ingestion
 
 
 [5]
 As pointed out in footnote 2, supra, this was incorrect by some two and a half hours
 
 
 [6]
 Reference to this chart shows how dramatic a difference the use of the longer time interval makes in the picture that purports to portray not only JoAnn's peak level, but also her position relative to others whose cases were superimposed on the chart. The prejudicial effect of this was heightened by the printing of the word 'Lethal' at the 160 miligrams percent line and the fact that the 200 line (dotted line in the Appendix) and the 'x' identifying JoAnn Rewis were drawn in red ink, whereas the rest of the chart was black
 
 
 [7]
 It is to be particularly noted that the Rewis child was shown on the chart to be at the 200 miligram line, because the 87.5 miligrams percent projection was drawn at between twenty-two and twenty-three hours following ingestion, a figure which we have shown to be wrong
 
 
 [8]
 'Q. This graph is only a diagnostic aid, is it not?
 A. (Dr. Done) Yes, it is pointed out in the paper.'
 
 
 [9]
 'Q. However, in this particular case that we have just computed, you can't say, even from your research, that the salicylate level, the actual peak level, was even as high as 160 can you?
 A. No.'
 
 
 [10]
 It is quite significant that the trial court placed sufficient weight on this statement to quote it in the court's opinion
 
 
 [11]
 The Court said (445 F.2d 1306): 'In view of the above, we reverse the district court's holding that Dr. Finley was not negligent in examining Joann Rewis and that there was no malpractice involved in his examination, diagnosis or making of additional tests. Because the district court found no negligence, there is absent any finding on the issue of causation and other relevant issues. The case is remanded to the court below for further findings upon all relevant issues raised by the pleadings and the evidence. Since the case was tried to the court without a jury, such findings may be made upon the record of evidence now before the court, or the district court in its discretion may reopen the case for the development of further evidence.'
 
 
 [12]
 Counsel for the United States had earlier requested that decision in the case be delayed until a transcript of the January 7, 1972, hearing was available. This was filed on July 13th last
 
 
 [1]
 Rewis v. United States, 5 Cir. 1971, 445 F.2d 1303. The first appeal is reported at 369 F.2d 595 (5 Cir. 1966)
 
 
 [2]
 The district judge's Findings of Fact and Conclusions of Law are reproduced as Appendix A to this dissenting opinion
 
 
 [3]
 Eleven years after the child's death in September, 1963, and following three trials in the district court and appeals to this court