**Vivian GARCIA, Admx. of the Estate of Alberto S. Garcia, Deceased**

v.

**DOVER SHIPPING COMPANY and Keystone Shipping Company**

v.

**STAPLETON LAUNCH SERVICE.**

Civ. A. No. 70–205.

United States District Court, E. D. Pennsylvania.

April 25, 1974.

Avram G. Adler, Philadelphia, Pa., for plaintiff.

John T. Biezup, Philadelphia, Pa., for defendants.

Robert Cox, Philadelphia, Pa., for third party defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Before the Court are the plaintiff's motions for judgment or directed verdict or for a new trial in the above case. This case was tried for five days before a jury and involved a claim of plaintiff's decedent (Garcia) who had been hired by Dover Shipping Company and Keystone Shipping Company, owner and operator ("Owner"), respectively, of the "Sinclair Texas," on December 22, 1969, on which date the "Sinclair Texas" was in navigable waters of the United States and specifically at the Stapleton anchorage in the harbor of New York.

At the time Garcia was hired to be a crewman on the "Sinclair Texas," he

held an able-bodied seaman's license, was hired to be a quartermaster on the ship, passed a physical examination for the purpose of his employment, and was directed to report to the port agent in the port of New York, who furnished the crewman with a ticket for passage from shore to the "Sinclair Texas" at anchorage by means of a motorized launch owned and operated by the Stapleton Launch Service ("Launch").

Launch agreed to render the launch service to the Owner in return for the payment to the launch service of three dollars ($3.00) per person carried one way on any launch trip between the "Sinclair Texas" and the shore.

On December 22, 1969, Garcia, in accordance with the directions furnished to him by the Owner and its port agent and in pursuance of the permission represented by the launch ticket, boarded the launch, together with another crew member hired to be a cook on the "Sinclair Texas"; and the two passengers, together with the only crew member of the launch (its pilot), left the Stapleton dock and traveled directly to the "Sinclair Texas" between 8:00 p. m. and 9:00 p. m., in the darkness, and over water that was rough and choppy.

When the launch arrived at the port side of the "Sinclair Texas" and at the point where crew members of the ship had lowered a jacob's ladder to the launch to permit boarding by Garcia and the other crewman, the bow of the launch traveled from the high point of each water swell to the bottom point (approximately two to three feet) and returned to the high point in a time span of between six and seven seconds.

The launch operator caused the starboard fore-portion of the launch to remain in contact with the port side of the "Sinclair Texas" and from this position the reasonably safe and accepted customary procedure for boarding the ship from the launch would be for the person seeking to board to position himself near the jacob's ladder and, at such

time as the bow of the launch hit its highest point on any swell, after the party was properly positioned, to place a foot firmly on the highest rung that could be reached, place both hands on either side of the jacob's ladder connecting the rungs, and immediately move up the ladder as quickly as possible in order to avoid the possibility that the bow of the launch, on the return from the low point of a swell to the highest point, would interfere with or strike the party climbing the ladder.

The jacob's ladder used is oftentimes referred to as a "pilot's ladder" and consists of a series of horizontal rungs about four inches (4″) in depth, approximately eighteen inches (18″) in length, and spaced approximately one foot (1′) apart from the top to the bottom between parallel rope sides.

A jacob's ladder is of widespread use for boarding ships. When not in use, it can be rolled up and, when in use, is unrolled and secured at its only place of connection with the ship, which in the case of the "Sinclair Texas" was at the top of the deck rail which was at a point approximately nine feet (9′) from the deck of the launch where Garcia and the other crewman stood in preparation for positioning to climb the ladder and board the ship.

At the time of boarding, the other crewman (the cook) attempted to board the ladder but was unsuccessful in doing so in that he had difficulty due to either the weather conditions, inability to properly position himself, or other reasons not otherwise apparent or explained, but sufficient to cause that crewman to forego further attempts to climb the ladder.

Garcia promptly thereafter positioned himself on the launch in readiness to climb the ladder and, at such time as the launch hit its highest point, he stepped onto the jacob's ladder and did not immediately begin to advance upward but "hesitated" for such a period of time that the launch, on its return from the low point of the swell to the high point, came

in contact with Garcia's left foot and ankle.

After the accident, Garcia advanced the remaining one or two steps up the ladder and was thereafter helped over the rail by a third-mate of the "Sinclair Texas" and a representative of the port agent for the shipowner and operator and another crew member, who had been at the rail where the ladder was connected during the entire boarding attempt, it being the purpose of the third-mate and the port agent's employee to return to shore on the launch after the arriving crew members had boarded.

The jury was provided with the following written interrogatories which were answered as shown in arriving at the final verdict in the case:

## "INTERROGATORIES (QUESTIONS) TO THE JURY

"1(a). Was the ship 'Sinclair Texas' unseaworthy?　　　　　　　　　　　　　YES＿＿＿　NO X

(b). If your answer to question 1(a) is 'Yes,' was that unseaworthiness a proximate cause of Garcia's injury?　　　　　　　　　　　　YES＿＿＿　NO＿＿＿

"2(a). Was Dover Shipping Company, shipowner, or Keystone Shipping Company, operator, by their agents or employees, negligent?　　YES＿＿＿　NO X

(b). If your answer to 2(a) is 'Yes,' was that negligence, in whole or in part, a cause of Garcia's injury?　　　　　　　　　　　　　YES＿＿＿　NO＿＿＿

"3(a). Was the launch 'Marie S' unseaworthy?　YES＿＿＿　NO X

(b). If your answer to question 3(a) is 'Yes,' was that unseaworthiness a proximate cause of Garcia's injury?　　　　　　　　　　YES＿＿＿　NO＿＿＿

"4(a). Was Stapleton Launch Service, owner of the launch 'Marie S,' by its officers, employees or launch operator, negligent?　　　　YES＿＿＿　NO X

(b). If your answer to question 4(a) is 'Yes,' was that negligence, in whole or in part, a cause of Garcia's injury?　　　　　　　　　YES＿＿＿　NO＿＿＿

"5(a). Was Alberto S. Garcia contributorily negligent?　　　　　　　　　　　　　　YES X　NO＿＿＿

(b). If your answer to question 5(a) is 'Yes,' was this contributory negligence a proximate cause of his injury?　　　　　　　　YES X　NO＿＿＿

(c). If your answer to questions 5(a) and 5(b) are both 'Yes,' to what extent, expressed in a percentage, was Garcia's contributory negligence a cause of his injury?　　　　　　　＿＿100＿＿ %
(PERCENTAGE)

"Only answer No. 6 if your answer to either 3(a) or 4(a) is 'Yes.'

"6. Did Dover Shipping Company, shipowner, or Keystone Shipping Company, operator, by their agents or employees, do anything that precluded the Stapleton Launch Service from rendering reasonably safe, proper, and workmanlike service in respect to any occurrence that was a proximate cause of the accident and plaintiff's injuries?　　YES＿＿＿　NO＿＿＿"

*Discussion*

■ Plaintiff filed a motion for a directed verdict or for a new trial. She set forth in her motion as grounds a variety of reasons that can be said to be standard in cases like this and in respect to plaintiffs similarly situated to plaintiff in this case. The principal argument advanced in the brief and at the argument, however, revolved around the finding of the jury and the Court's charge in respect to contributory negligence. There are two basic arguments in this respect. The first argument is that, since the plaintiff was found to be 100% contributorily negligent in answers to written interrogatories propounded by the Court, such a finding precluded the jury from concluding whether the vessel owner was negligent or the launch was unseaworthy. The difficulty with the logic of plaintiff's argument in this respect is that it has reversed the jury's findings in the order in which they were submitted so that the plaintiff begins to argue from the *last* finding of the jury and concludes that all the other findings were based upon this. This is an assumption clearly not warranted, and it is obviously contrary to the manner in which the interrogatories were prepared, submitted, and apparently answered by the jury. The jury considered the plaintiff's position in respect to negligence and seaworthiness and proximate cause *before* it was called upon to consider the question of contributory negligence. Accordingly, while the finding of contributory negligence (100%) was not necessary in order to absolve the defendants from liability because of the other findings of the jury, it cannot be said that the contributory negligence finding so obscured the jury's understanding of the other issues as to deny the plaintiff her opportunity for appropriate findings on other issues in the case.

The second finding is on the content of the Court's charge on contributory negligence. It should be noted that the Court went over every one of the interrogatories in detail with the jury in its charge (N.T. 5–121, 5–123).

Plaintiff says in its brief and argued, "At no time did the Court point out that the actions, which the defendant[s] claim rise to the dignity of contributory negligence, must be a proximate cause of plaintiff's decedent's injuries." This is in direct conflict with the charge of the Court made especially at the request of the plaintiff and appearing in the notes of testimony at page 5–133 as follows:

"The defendants raise the issue of contributory negligence. That means they have, in other words, the party who raises that, has the burden of proof you see. It is up to the party with the burden of proof to prove contributory negligence. Now, in that respect, in considering the issue of contributory negligence, you will have to consider whether the plaintiff under the circumstances exercised reasonable care and whether or not if you find that he failed to, that was a proximate cause as I have defined it to you of his injury. If it was not a proximate cause, then contributory negligence cannot adversely affect the plaintiff. If it was a proximate cause of his own injury, then you will have to consider the percentage that I mentioned to you."

The previous reference by the Court was to its charge to the jury, appearing at N.T. 5–118, on proximate cause, in part, as follows:

". . . An injury or damage is caused or what we call proximately caused by an act or a failure to act whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission."

■ In reference to the defendant's alleged negligence, the Court adequately and properly instructed the jury as to the doctrine of proximate causation. It is not necessary for the trial judge to repeat verbatim the definition of proximate

causation when instructing the jury on the issue of plaintiff's contributory negligence. Reference by the Court to the charge on causation given with respect to defendant's negligence is sufficient to provide the jury with a clear and accurate statement of the law. The Court's charge on contributory negligence, considered as a whole, was fair and complete.

█ The verdict in the instant case was based on proper instructions and supported by the evidence presented. Accordingly, the verdict must not now be disturbed. McPhee v. Reichel, 461 F.2d 947, 948 (3rd Cir. 1972); James v. Continental Ins. Co., 424 F.2d 1064, 1065 (3rd Cir. 1970).

Furthermore, at the close of the Court's charge, a sidebar conference was held at which time counsel for the plaintiff objected to the Court's failure to charge the jury that the defendant had the burden of proof on the question of plaintiff's contributory negligence. At the conclusion of the post-charge sidebar conference, the Court readdressed the jury and charged as requested by plaintiff's counsel and as previously outlined in this Opinion. Immediately after the recitation of the additional instructions, the following exchange between the Court and counsel took place:

"Anything else, counsel?

"MR. BIEZUP: No, sir.

"MR. COX: No, sir.

"MR. ADLER: No, sir." (Plaintiff's counsel.) [N.T. 5–136]

█ Counsel cannot now properly argue to be error an instruction which he in fact requested and which the Court gave the jury. Although counsel had the fullest opportunity to object to the charge when given or to request a modification or further explanation of such charge, counsel exclaimed "No, sir" in response to the Court's invitation for further comments or suggestions of counsel.

The Court concludes that the various contentions raised by the plaintiff do not warrant the granting of the relief requested.