**Pearly WILCOX, Individually and as next Friend of Jessie Lee Wilcox, Jr., Bonnie Fitzhenry, Hazel Louis Wilcox and Vicky Wilcox**

v.

**CARINA MARITIME CORPORATION.**

Civ. A. No. B–82–519–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

May 24, 1984.

Stanley W. Crawford, Jim Richards, Crawford, Grissom, Crow & Richards, Houston, Tex., Gilbert I. Low, Orgain, Bell & Tucker, Beaumont, Tex., for plaintiffs.

Hubert Oxford III, Dennis Alenik, Benckenstein, Oxford, Radford & Johnson, Beaumont, Tex., for defendant.

James B. Warren, Fulbright & Jaworski, Houston, Tex., for intervenor.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

This maritime personal injury case is before the Court under Section 5(b) of the Longshoreman's and Harborworker's Compensation Act, 33 U.S.C. 905(b) (1972). This is a negligence action under that Act, and as such, must be determined under landbased tort concepts. *Gay v. Ocean Transport and Trading, Ltd.,* 546 F.2d 1233, 1235 (5th Cir.1977).

The action is brought by the survivors of Jessie Lee Wilcox, a longshoreman who suffered a fatal heart attack while working on the *M/V Grace Boeing,* a ship wholly owned by Defendant, Carina Maritime Corporation. The Plaintiffs allege that the Defendant was negligent in not having available bottled oxygen for Wilcox to breathe after his attack, and that this lack of oxygen resulted in Wilcox's death. Trial was held on this case on January 26, 1984,

and both parties submitted post trial briefs. After reviewing the evidence, this Court finds that the Defendant owed Wilcox no duty to have or maintain an oxygen bottle aboard ship, and therefore was not negligent. For the reasons described below, the Court will enter judgment for the Defendant and against the Plaintiff.

## I.  FACTS

On July 25, 1981, Jessie Lee Wilcox, a 40-year-old longshoreman employed by a stevedoring company, was levelling grain in the cargo hold of the *Grace Boeing*, a Liberian Flag Ship docked at the Port of Beaumont. It was a hot summer day, and Wilcox, who suffered from high blood pressure and from a moderate heart condition, had told his fellow longshoreman that he was not feeling well. After finishing their work in the hold, the longshoreman came up onto the *Grace Boeing*'s decks. Suddenly Wilcox collapsed, and began shaking and trembling. His co-worker, Perry Berwick, came to Wilcox's aid and began to give Wilcox mouth-to-mouth resuscitation. A dock-side employee, Paul Apostalo, arrived approximately one minute after the attack, and began to give Wilcox coronary pulmonary resuscitation (CPR). Before administering CPR, Apostalo checked Wilcox's vital signs. He found none.

What happened next is the subject of hot dispute in this case. While Apostalo was administering CPR, Berwick requested an oxygen bottle from one of the Chinese crew of the *Grace Boeing*. The crew member, who because of a language barrier may have had trouble understanding Berwick, soon returned with some sort of breathing device. The Plaintiffs allege that the crew member brought Berwick a medical oxygen bottle and mask. The Defendants counter that the crew member brought a "demand" type apparatus containing compressed air. This type of apparatus works only when valves to the air bottles are turned on, and when the apparatus' face mask is placed on the user's face, and user inhales.

In any case, Berwick placed the device on his own face to test it. No oxygen or air was released. Believing the breathing device to be broken, Berwick threw it away. The Plaintiffs claim that this "oxygen" mask collapsed on Berwick's face, and that it was indeed, broken. The Defendants state that Berwick simply did not know how to use the "air" device.

Meanwhile, an ambulance had been summoned. The ambulance, with trained medical personnel in attendance, arrived dockside a little over five minutes after the attack. The ambulance attendant who examined Wilcox when the ambulance arrived found that Wilcox exhibited no vital signs, and he believed Wilcox was dead at the scene. The ambulance transported Wilcox to the emergency room of Baptist Hospital in Beaumont, where he was pronounced dead on arrival. The total elapsed time between the onset of the attack and arrival of Wilcox at the hospital could have been no more than thirty minutes.

An autopsy revealed that Wilcox did, indeed, die from a heart attack. More specifically, Wilcox died because of a thrombosis or occlusion of the anterior descending branch of the left coronary artery. This artery is known as "the artery of sudden death" because of the usual nature and result of attacks associated with it. It is known that death related to coronary artery disease is the result of a deprivation of oxygen from the vital centers of the body, particularly the heart and the brain. The occlusion of the artery that occurs reduces the blood supply to the heart; thus, instead of acting as a pump, the heart begins to quiver or fibrillate, causing a coronary attack. In some cases, administering oxygen to a victim will increase the oxygen level in the blood, thus helping the heart to pump, and aiding a coronary attack victim. Plaintiffs claim that this is such a case. Yet, for the reasons stated below, this Court can find no way to relate that lack of oxygen with any negligence on the part of the Defendant.

## II.  ANALYSIS

### Was There a Duty to Wilcox On The Part of the Ship?

■ The basic premise of all tort law is that before the Plaintiff can recover in any

negligence action, he must show that the Defendant owed him some duty. Prosser has described duty as existing when "a relation exists between the parties [such] that the community will impose a legal obligation upon one for the benefit of the other—or more simply, whether the interest of the Plaintiff which has suffered invasion was entitled to legal protection at the hands of the Defendant." W.E. PROSSER, THE LAW OF TORTS, 206 (4th Ed. 1971). Prosser and other commentators have made it plain that this concept of duty is a changing one. Different circumstances, different parties, and changing community standards can impose a duty where one did not exist before. In the final analysis, duty exists when "In general, reasonable men would recognize it and agree that it exists." PROSSER, *supra* at 327.

Plaintiffs argue that a duty existed here. They allege that changing social conditions mandated that the *Grace Boeing* have oxygen, and that indeed a maritime *custom* had arisen requiring ships carry oxygen on board. Custom can establish a duty, and frequently does. *See Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 171, 101 S.Ct. 1614, 1624, 68 L.Ed.2d 1 (1981). However, no custom has been proven here. It is undisputed that no statute or regulation existed requiring the *Grace Boeing* to carry an oxygen bottle. While this does not dispose of the issue, a maritime regulation would have been important evidence that a custom, and thus a duty, did exist. Instead, the absence of a statute is evidence to the contrary.

■ At trial, the Plaintiffs presented the testimony of Captain Robert Underhill, as a maritime expert. Underhill testified that on each of the "six or seven" ships that he had been on when the need for oxygen arose, the ships had oxygen available. Yet Underhill stated that he had been on "thousands of ships" in his career. Certainly he could not draw a conclusion that oxygen was on board all ships because he had actually seen oxygen on six or seven ships out of the thousands he had been on. Other testimony undermined Underhill's. Lieutenant Commander Robert D. Arnett, Chief of the local Coast Guard Marine Safety Inspection Division, testified for the Defendant. Arnett had spent ten years inspecting ships. Part of his duties included examining ship's hospitals and medicine chests. Of the hundreds of vessels Arnett had inspected, he stated he had seen oxygen on only four or five ships. Other testimony supported Arnett's statements. In sum, the evidence indicates that no more than a handful of ships carry medicinal oxygen. This Court can thus not find a custom that would give rise to a duty.[1]

■ Even if this Court had found a duty for a ship to carry oxygen, Wilcox's survivors could not recover in this instance. Wilcox was a longshoreman, not a *Grace Boeing* employee or crew member. The standard of duty owed by a ship to a longshoreman has been described in *Scindia Steam Navigation Co. v. De Los Santos, supra*, 451 U.S. at 172, 101 S.Ct. at 1624:

> Absent contract provision, positive law or custom to the contrary [a shipowner] has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo oper-

---

**1.** Plaintiffs have relied on two recent cases decided by the Texas Supreme Court: *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307 (1983), and *Osuna v. Southern Pacific Railroad*, 641 S.W.2d 229 (Tex.1982). These two controversial cases illustrate that new areas are being explored in the area of duty in negligence law. *Otis Engineering* involved a situation where an employee came to work drunk and the employer told the employee to go home. On the way home, the employee caused a fatal accident, and the employer was held liable. In *Osuna*, a railroad had voluntarily erected an automatic signal device at a railroad crossing but then failed to properly maintain it. The railroad was thus liable when an accident occurred because of the failure of that signal. Neither of these cases are applicable here. First, this case is decided under Federal maritime law, not the state law of Texas. Second, the facts and holding of both cases differ significantly from this one. A reading of the *Otis Engineering* opinion reveals that the Court narrowed its holding to the employer-employee relationship. *Otis Engineering*, 668 S.W.2d at 309. This is not the case here. In *Osuna*, the public's reliance on the signal had given rise to a custom; a custom that this Court could not find in the instant case.

ations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoreman for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.

*See also Hill v. Texaco,* 674 F.2d 447 (5th Cir.1982). In the instant case, no fact pattern exist that would indicate the shipowner knew of or should have known Wilcox was engaged in the physical labor of raking grain in the ship's hold, a usual occupation for a longshoreman. At least one circuit heavily involved in maritime law has held that a heart attack arising from the physical stress that is an integral part of a longshoreman's work is a harm that cannot have been anticipated or guarded against. *See Melanson v. Caribou Reefers, Ltd.,* 667 F.2d 213 (1st Cir.1981); *Raymond v. I/S Caribia,* 626 F.2d 203 (1st Cir.1980).

■ Furthermore, there is evidence establishing that a ship's crew does not usually involve itself in providing first aid to a longshoreman. This is the stevedore's responsibility. There is some statutory authority to support this.[2] Testimony at trial by various longshoremen indicated that it was their understanding that it was the longshoremen who were responsible for first aid for a longshoreman. Nothing in this case has given rise to a *Scindia* duty. While there may be a humanitarian requirement for the ship's crew to aid a longshoreman—fulfilled in this case by the crew—there is no *legal* requirement.

### Are Defendants Liable Under the Good Samaritan Doctrine?

The plaintiffs' best argument, though it fails, is that, having undertaken the task of providing aid to Wilcox, the ship's crew was bound to a standard requiring them to exercise reasonable care in assisting him. This argument is, in effect, the "Good Samaritan" Doctrine. Section 323 of the RESTATEMENT (SECOND) OF TORTS defines this doctrine:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for the physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking. RESTATEMENT (SECOND) OF TORTS, § 323 (1977).

■ In the instant case, a finding of liability under the "Good Samaritan" Doctrine would require the establishment of two facts: first, that the breathing device was actually defective; and second, that the oxygen would have actually assisted Wilcox. Neither one has been proved.

---

**2.** 29 C.F.R. 1918.96(a) implies that an employer—in this case a stevedore—has the responsibility to maintain first aid and life-saving equipment for longshoremen. It reads:

§ 1918.96 First aid and life saving equipment. (a) Unless a first aid room is close at hand and a qualified attendant is prepared to render first aid to employees on behalf of the employer, the employer shall furnish a first aid kit for each vessel on which work is being performed, except that when work is being performed on more than one small vessel at one pier only one kit shall be required. The kit shall be kept in the immediate vicinity of the vessel and at least one employee holding a currently valid first aid certificate shall be close at hand.

The International Labor Organizations "Convention concerning the protection against accidents of workers employed in loading or unloading ships" reads in relevant part:

ARTICLE 13

At docks, wharves, quays and similar places which are in frequent use for the [work] performed on shore or on board ship of loading or unloading a ship such facilities as having regard to local circumstances shall be prescribed by national laws or regulations shall be available for rapidly securing the rendering of first-aid and as serious cases of accident removal to the nearest place of treatment. Sufficient supplies of first-aid equipment shall be kept permanently on the premises in such a condition and in such positions as to be fit and readily accessible for immediate use during working hours. The said supplies shall be in charge of a responsible person or persons who shall include one or more persons competent to render first-aid and whose services shall also be readily available during working hours.

The great weight of evidence presented indicates that the conflict regarding whether an air or oxygen device was delivered to Wilcox's helpers should be resolved in favor of Defendant. The Court finds the ship's crew delivered what was known to be aboard the vessel: A demand type breathing apparatus containing compressed air. For it to become operable, valves must be opened, and the mask must be placed with pressure on someone's face. Rather than being defective, it seems that Wilcox's fellow longshoreman did not know how to operate the apparatus.

Furthermore, the Plaintiff has presented to the Court no plausible evidence to prove that oxygen would have helped Wilcox. Plaintiffs' medical expert, Dr. Howard Wilcox,[3] testified at trial that the longshoreman's chance of survival would have been improved if 100% oxygen could have made its way from the lungs into the decedent's blood stream. Still, Dr. Wilcox would not state with reasonable medical probability whether Plaintiff could have been stabilized and gotten to the hospital had he been given oxygen immediately after the attack. Testimony indicated that Wilcox was not breathing within one minute of his collapse. Oxygen can be useful to *aid* a heart attack victim's breathing. It can do no good when the victim is not breathing because there is no way to propel the oxygen into the lungs. The proper course in such cases is for mouth-to-mouth resuscitation to be performed; and this was done. The fact that Wilcox suffered from a heart condition buttresses the conclusion that Wilcox's condition was such that no oxygen would have aided him.

The Plaintiffs argue that the case of *Pluyer v. Mitsui O.S.K. Lines Ltd.*, 664 F.2d 1243 (5th Cir.1982) should control here. In that case, a stevedore had not equipped its longshoring gang with a ladder. The ship's crew thereupon furnished the longshoremen with a defective ladder to do their work. The Fifth Circuit held the ship liable on the ground that the crew had committed "active negligence" by providing the unsafe ladder. Plaintiffs contend that *Pluyer* is applicable here because the *Grace Boeing's* crew actively provided a breathing device. The Plaintiffs' reliance on *Pluyer* is misplaced for the simple reason that, as described above, they have not proven a defect that was the proximate cause of Wilcox's death. Under the "Good Samaritan" Doctrine, it cannot be said that Wilcox suffered because there was no oxygen for him to breathe. It follows that there was no aggravation of Wilcox's attack.

### III. CONCLUSION

Though it is a sad conclusion, it nevertheless seems clear that no matter what anyone—longshoreman or crew member—had done, Jessie Lee Wilcox would have still died on that ship deck that day. To impose fault in this case would in effect impose liability on the Defendant, not because it was negligent, but because the crew member's humanitarian efforts were not successful in saving Wilcox. To find a duty here would not be to judicially recognize a changing social condition; it would be to create a duty where none exists. This the Court cannot do. Accordingly, it is

ORDERED, ADJUDGED and DECREED that the Plaintiffs PEARLY WILCOX, ET AL, do have and take nothing from the Defendant, CARINA MARITIME CORPORATION. Each party shall bear its own costs.

---

**3.** No relation to decedent.