Helen Ehret BACH, Eugene G. Bach III, and Janet B. Lashley, Plaintiffs,

v.

TRIDENT SHIPPING CO., INC.; Kaiser Aluminum and Chemical Corp.; and the JAYMAT TRIDENT, in rem, her engines, tackle, appurtenances, equipment, etc., Defendants.

Civ. A. No. 87-5899.

United States District Court, E.D. Louisiana.

March 27, 1989.

See also 708 F.Supp. 772.

Gregory F. Gambel, Mark W. Smith, New Orleans, La., for plaintiffs.

Robert H. Murphy, Thomas D. Forbes, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Kaiser Aluminum & Chemical Corp. and Trident Shipping Co., Inc.

O'Neill, Eichin, Miller & Breckinridge, John N. Critchlow, New Orleans, La., for Kaiser Aluminum and Chemical Corp.

## ORDER AND REASONS

PATRICK E. CARR, District Judge.

This matter is before the Court on defendants' motion for summary judgment. By minute entry of March 16, 1989, the Court took the motion under submission on the briefs. For the following reasons, the Court now GRANTS the motion.

### I.

On December 26, 1986, Eugene G. Bach Jr. suffered a fatal heart attack while aboard the M/V JAYMAT TRIDENT as a compulsory river pilot. His surviving wife and two children have sued the vessel owner, the voyage charterer, and the vessel for his death.

Bach was a 61 year old male who had worked as a river pilot for about 36 years;

he was a member of the Crescent City River Pilots Association, whose members serve as compulsory river pilots on the Mississippi River between New Orleans and Pilottown.[1] Among his normal duties as a pilot were climbing pilot, or Jacob's, ladders [2] and climbing flights of stairs from the main deck of a vessel up to the wheelhouse of a vessel.

On December 26, 1986, Bach was to serve as the compulsory river pilot aboard the JAYMAT TRIDENT, an oceangoing bulk cargo vessel that is registered in and flies the flag of the Cayman Islands and whose officers are all Chinese. Early that morning, Bach was transported to the JAYMAT TRIDENT by a pilot boat, the M/V LITTLE RAY. The LITTLE RAY is equipped with two vessel boarding platforms affixed at the top of its wheelhouse; these platforms stand 11 feet 1½ inches above the waterline.

To board the JAYMAT TRIDENT, Bach stepped from one of the LITTLE RAY's boarding platforms onto a pilot ladder hanging on the port side of the JAYMAT TRIDENT and then climbed the ladder; [3] according to the vessel log, he boarded the vessel at 2:30 a.m. At that time, the deck of the JAYMAT TRIDENT stood 32.36 feet (9.86 meters) above the waterline. Thus, Bach had to climb on the pilot ladder a distance of at most about 21¼ feet.

Once aboard, Bach climbed four flights of stairs from the main deck to the vessel's wheelhouse, from which pilots would direct the vessel. When he reached the wheelhouse, he replaced the New Orleans/Baton Rouge compulsory pilot, Lewis H. Taylor, who then proceeded down the same stairs to disembark by the same pilot ladder.

Soon thereafter (according to the vessel log, it was 2:32 a.m.), Bach suddenly collapsed to the floor.

According to Captain Jao Chih-ping's deposition, the quartermaster, who was in the wheelhouse when Bach collapsed, notified the captain, who returned to the wheelhouse; the captain tried to lift Bach, but was unable because Bach was unconscious; the captain then called back Taylor to resume piloting the vessel, asked Taylor to call the Coast Guard for medical help, and gave orders to drop anchor immediately; the second mate, who was the designated medical officer, came to the wheelhouse and, at Taylor and the captain's request, watched over Bach to see that no one tripped over him in the dark. According to Taylor's deposition, he returned to the wheel, took control of the navigation (according to the vessel log, it was 2:34 a.m.), and, while he was maneuvering the vessel to anchor, asked a crewmember to check Bach's pulse; the crewmember apparently found no pulse.

There is no evidence that either Taylor or any crewmember attempted to perform cardiopulmonary resuscitation (CPR) or to give other direct first aid to Bach, other than what is set forth above.

According to the vessel log, the Coast Guard did not arrive until 3:15 a.m. and emergency medical service technicians (paramedics) not until at 3:30 a.m. Their efforts to save Bach were to no avail; he was dead.

The Orleans Parish Coroner's Office performed an autopsy on Bach later that morning. It found that he had "severe stenotic calcific coronary atherosclerosis

---

1. Although some spell this location as two words (viz., "Pilot Town"), see, e.g., *Cenac Towing Co. v. Keystone Shipping Co.*, 404 F.2d 698, 700 (5th Cir.1968), *aff'g In re Cenac Towing Co.*, 276 F.Supp. 317, 320 (E.D.La.1967), the preferred spelling appears to be one word (viz., "Pilottown"). *See, e.g.*, 33 C.F.R. § 110.195(a)(2) (1987); La.R.S. § 34:996(A) (West Supp.1989); *Allied Chemical Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1047 (5th Cir.Unit A 1981) (Brown, J.).

2. A pilot, or Jacob's, ladder is a rope ladder, generally with wooden steps, used to board larg-

er vessels. *See, e.g., Nye v. A/S D/S Svendborg*, 501 F.2d 376, 378 n. 1 (2d Cir.1974), *cert. denied sub nom. The Svendborg v. Marine Engine Specialties Corp.*, 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975).

3. The record before the Court does not indicate how the top of the pilot ladder was attached to the vessel—whether it was attached directly to the side of the vessel or instead by way of a short accommodation ladder or some other means.

[with] recent ischemic myocardial changes." It classified his death as "natural." To paraphrase plaintiffs' expert medical report in layman's terms, Bach had a very acute heart disease and died from a heart attack.[4]

At his deposition, plaintiffs' medical expert, Dr. John H. Phillips Jr., testified (1) that the greater the physical stress Bach experienced just before his collapse, the greater was the likelihood that such stress played "an increasing role in his death" and (2) that a person climbing a ladder must exert more physical stress when such climbing requires the use of both hands and feet than when such climbing requires only the use of feet.[5] Further, he testified that Bach's chances of survival would have been greater had he received CPR within four minutes of his collapse, but added that even if a crewmember had administered CPR and even if ideal professional medical attention had been available minutes after his collapse, the likelihood that Bach would have died anyway was 85% or greater. To quote Dr. Phillips' report: "his chances for ultimate survival were clearly not very favorable ... and the prognosis following even the ideal scenario as outlined [in the report] would be poor.

Defendants now move for summary judgment on three points:[6] (1) plaintiffs cannot establish legal causation from Bach's having to use a pilot ladder; (2) defendants owed no duty to apply CPR or other first aid to Bach; and (3) plaintiffs cannot establish legal causation from any inadequate medical attention on the crew's part because, according to plaintiff's own medical expert, the chances of Bach's dying even if he had had the best medical attention as soon as he collapsed were more probable than not.

## II. *The ladder*

Plaintiffs argue that defendants should have provided Bach with an angled accommodation ladder [7] instead of a vertical pilot ladder for the access all the way from the pilot boat to the JAYMAT TRIDENT. As sole support, they cite SOLAS Regulation 17(a)(ii) for Safety of Navigation:

Ships engaged on voyages in the course of which pilots are likely to be employed shall comply with the following requirements:

(a) *Pilot Ladders*

. . . .

(ii) The ladder shall be secured in a position so ... that the pilot can gain safe and convenient access to the ship after climbing not less than 1.5 metres (5 feet) and not more than 9 metres (30 feet).... Whenever the distance from sea level to the point of access to the ship is more than 9 metres (30 feet), access from the pilot ladder to the ship shall be by means of an accommodation ladder or other equally safe and convenient means.[8]

---

4. Specifically, the report states that Bach had "advanced occlusive coronary artery disease" and "suffered the onset of ventricular tachycardia and then ventricular fibrillation which ultimately resulted in his death." At his deposition, plaintiffs' medical expert more fully explained these conditions and their effects on Bach.

5. *Cf. Browne v. Makin,* 177 F.2d 753, 756 (5th Cir.1949) ("a Jacob's ladder ... require[s] full use of [a person's] hands, arms, and feet").

6. Plaintiffs argue that the motion is untimely. While the motion was brought after the Court's initial cut-off date, the Court exercised its discretion by granting defendants specific leave to bring the instant motion. *See Fox v. Taylor Diving & Salvage Co.,* 694 F.2d 1349, 1357 (5th Cir.1983). *See generally* F.R.Civ.P. 16(b) (scheduling orders may be modified on good cause shown).

7. For the Fifth Circuit's description of one accommodation ladder, see *Lamar v. Admiral Shipping Corp.,* 476 F.2d 300, 301 (5th Cir.1973) ("The vessel was equipped with an aluminum accommodation ladder or gangway approximately thirty feet long and thirty inches wide with thirty steps. It was affixed to a turntable at the top with a through bolt, and the turntable was held in place with through bolts and plate. The base rested level on the cement apron of the dock on a roller. The steps were level."). For other descriptions and definitions, see *Nye,* 501 F.2d at 378 n. 1; D. Tver, *Ocean and Marine Dictionary* 2 (1979).

8. International Convention for the Safety of Life at Sea, 1974 (SOLAS 1974), ch. V, regulation no. 17(a)(ii), *done* Nov. 1, 1974, 32 U.S.T. 47, 243, T.I.A.S. No. 9700, at __ (entered into force for the United States on May 25, 1980; not ratified by the Caymen Islands), *reprinted at* 6B *Bene-*

This regulation has been codified at 46 C.F.R. § 96.40–1(g) for cargo vessels "that normally embark[ ] or disembark[ ] a pilot from a pilot boat or other vessel":

> Whenever the distance from the water's edge to the point of access is more than 30 feet, access from a pilot ladder to the vessel must be by way of an accommodation ladder or equally safe and convenient means.[9]

Plaintiffs do not otherwise argue that the pilot ladder Bach climbed was defective or below industry or statutory standards in any way or that defendants or anyone else should have known that Bach or anyone else might suffer a heart attack from climbing this or any other pilot ladder. Nor do they present any evidence that Bach had any injury or accident while climbing or difficulty in climbing this pilot ladder or that Bach or anyone else had at any time complained about having to climb this or any other pilot ladder.

All parties agree that at least one of the two essentially identical regulations applies to the JAYMAT TRIDENT, whose freeboard for the period at issue exceeded 30 feet. The parties diverge, however, on the interpretation of the regulations.

■ Neither the SOLAS nor the CFR regulation requires that a ship is to extend an accommodation ladder from the ship all the way to a pilot boat whenever a pilot embarks the ship; specifically, the regulations do not read: "whenever a vessel's freeboard exceeds 30 feet, access from *another vessel* must be by way of an accommodation ladder, and no other means." Instead, the regulations merely require that access from *a vessel's pilot ladder* to its deck be by way of an accommodation ladder *or other safe means.*[10] In other words, the regulations specifically contemplate just what was in use on the JAYMAT TRIDENT, namely, the use of pilot ladders for vessels whose freeboards exceed 30 feet. In sum, there is no evidence that defendants violated these regulations.[11]

Further, common sense rejects plaintiffs' position. To a large degree, as any seafarer knows, a vessel (especially a smaller vessel) often has little control over the everyday effects of waves and currents; even if a person knows the average size of waves at a given time or is very familiar with a given current, he rarely can foretell exactly how a particular wave or current may affect a vessel at any particular moment—just when and how far a vessel may rise, sink, rock, approach, or veer from a particular point. Seafarers must learn to compensate for these random, predictably unpredictable movements; thus is the art of navigation. Activities on and between vessels must anticipate the possibilities that natural phenomena often affect two near-by vessels very differently. Unlike accommodation ladders with their rigid frames more suitable for ship-to-shore movement when a vessel is tied down, pilot ladders are specially designed for the fluctuations in mid-stream vessel-changing operations such as those where a pilot boards

*dict on Admiralty* Doc. No. 14–8, at 14–400 (7th ed. 1987).

9. 46 C.F.R. § 96.40–1(g) (1987) (for "cargo and miscellaneous" vessels); *accord id.* § 32.90–1(g) (for tank vessels); *id.* § 77.40–1(g) (for passenger vessels); *id.* § 108.719(g) (for "mobile offshore drilling units operating under the U.S. flag"); *id.* § 195.40–1(g) (for oceanographic research vessels).

Because the Cayman Islands is not a signatory to SOLAS 1974, the CFR regulation applies to the JAYMAT TRIDENT, at least while it is within U.S. navigable waters. *See* 46 C.F.R. § 90.05–1(a).

10. For a description of this two-part arrangement, see *Nye,* 501 F.2d at 378 n. 1. As indicated above in footnote 3, the record does not reveal how the pilot ladder was attached to the vessel. This information, however, is irrelevant: plaintiffs do not complain about the means by which the pilot ladder was connected to the deck and present no *evidence* that the means in use, whatever it was, was unsafe or had any causal connection to Bach's death.

11. It is a separate issue whether an intended purpose of these regulations was to protect persons from over-exertion or instead whether the sole purpose of these regulations was to protect persons from falling or slipping or being struck by other objects. Because the Court finds no violation of these regulations, the Court need not address this separate issue.

a moving ship from a moving pilot boat.[12] Indeed, Judge Brown of the Fifth Circuit has commented that the use of pilot ladders is "routine."[13]

Because plaintiffs do not otherwise argue any violation of a statutory provision concerning ladders [14] and do not otherwise produce any evidence of a duty or custom for defendants to use an accommodation ladder that extends all the way from the JAYMAT TRIDENT to the LITTLE RAY or any evidence of negligence on the part of defendants in not using such a ladder, no basis of liability may lie for defendants' failure to provide such an accommodation ladder.

As plaintiffs concede,[15] climbing pilot ladders and several flights of stairs is a normal and customary part of any river pilot's job.[16] While the ordinary exertion and stress from the climb may have been what triggered Bach's heart attack, " '[a] heart attack due to ... physical exertion and stress, which are an integral part of a [pilot's] work, is not a harm that can reasonably be anticipated or guarded against.' "[17] In other words, such exertion and stress was not from any negligence on defendants' part.

In sum, there is no evidence of a genuine dispute that defendants were at all responsible for Bach's heart attack.[18]

### III. *CPR and first aid*

The sole remaining basis for liability is the alleged failure to provide adequate, timely first aid to Bach when he collapsed.[19]

Defendants assert that they owed no duty to provide first aid to Bach; in support, they cite "the general tort rule that no one has a duty to go to the assistance of another."[20] While defendants accurately describe the majority state law rule, general maritime law imposes at least a minimal duty on the facts here: a vessel that takes aboard a person—be he even a passenger or guest—owes that person "a duty to exercise 'reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances.' "[21] To the extent that a

---

**12.** If a swell causes the pilot boat suddenly to rise or rock, or to shift its lateral position, relative to the larger vessel, then a rigid ladder could knock into someone or something with considerable force or quickly move away from a person attempting to board it. The examples are numerous, the point is the same: these dangerous problems are less likely to occur with a flexible rope ladder than with a long rigid projection from a large vessel.

**13.** *See S/S Bethflor v. Thomas,* 364 F.2d 634, 635 n. 4 (5th Cir.1966); *see also Garcia v. Dover Shipping Co.,* 380 F.Supp. 607, 609 (E.D.Pa.1974) ("A jacob's ladder is of widespread use for boarding ships."), *aff'd without published op.,* 511 F.2d 1392–93 (3d Cir.1975).

**14.** The SOLAS regulation at issue does provide that a pilot be able to gain access to a ship after climbing not more than 30 feet. Here, however, it is undisputed that Bach did not have to climb more than 30 feet in travelling from the LITTLE RAY to the main deck of the JAYMAT TRIDENT.

**15.** *See* Pre–Trial Order, ¶ 7(4), at 8.

**16.** *See Browne,* 177 F.2d at 766.

**17.** *Melanson v. Caribou Reefers, Ltd.,* 667 F.2d 213, 214 (1st Cir.1981) (per curiam) (affirming a summary judgment dismissing a widow's general maritime negligence claim for the wrongful death of her longshoreman husband) (quoting *Raymond v. I/S Caribia,* 626 F.2d 203, 206 (1st Cir.1980), *cert. denied,* 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981)).

**18.** *Cf. Carlton v. M/G Transport Services, Inc.,* 698 F.2d 846, 848 (6th Cir.1983) (per curiam) (affirming a directed verdict for defendant who had no prior knowledge of decedent seaman's heart condition, where decedent died of a heart attack while at work on defendant's vessel).

**19.** *See Cities Service Oil Co. v. Launey,* 403 F.2d 537 (5th Cir.1968) (upholding wrongful death Jones Act award, where "[p]laintiff did not allege that decedent's heart attack was caused by Defendant, but rather [by] the failure of Defendant to provide prompt and adequate medical attention for a man who was obviously ill and unable to care for himself while aboard the ship.").

**20.** *Lazzell v. Booker Drilling Co.,* 816 F.2d 196, 198 (5th Cir.1987).

**21.** *Barbetta v. S/S Bermuda Star,* 848 F.2d 1364, 1371 (5th Cir.1988); *see Walsh v. Zuisei Kaiun K.K.,* 606 F.2d 259, 262 (9th Cir.1979) (ship owed drowning compulsory pilot a duty of rescue, even where there was no negligence on its part for the incident that created the need for

ship's crew voluntarily attempts more than is legally required to save a person in danger, "liability for negligent salvage is limited to situations in which the salvor, through want of due care, has worsened the position of the victim." [22]

In opposition to defendants' motion, plaintiffs present evidence that prudent crewmen may well have done considerably more than did the JAYMAT TRIDENT's crew. Specifically, they present evidence that a prudent master or officer would have been familiar with CPR techniques [23]—the inference being that at least one such person would have recognized Bach's predicament and immediately attempted to give him CPR, even in the emergency situation where the whole vessel was in danger because there was no pilot at the wheel. This evidence is enough to create a genuine dispute whether the captain and crew acted reasonably in the actions they took, that is, whether defendants breached their duty of care to Bach.[24]

It is a separate issue, however, whether this genuine dispute is one concerning a *material* fact.[25] It is not enough for plaintiffs to prove the breach of a duty; they must also prove by a preponderance of the evidence that such breach was a proximate cause of Bach's death.

---

the rescue); cf. *Theodories v. Hercules Navigation Co.,* 448 F.2d 701, 703 n. 6 (5th Cir.1971) (reversing judgment for widow whose husband died of a heart attack aboard a vessel, but noting that the vessel did owe him "the maritime duty of due care"). *But see Wilcox v. Carina Maritime Corp.,* 586 F.Supp. 1475, 1479 (E.D. Tex.1984) (there is no legal duty for a ship's crew to aid a longshoreman who suffers a heart attack on the ship).

As support for the duty to provide aid to Bach, plaintiffs cite 46 U.S.C. § 2303(a), which applies when "a vessel [is] involved in a marine casualty." The statute appears not to apply here, where the JAYMAT TRIDENT itself was not in any danger (viz., where there was no vessel collision, allision, grounding, power failure, etc.). *See Berg v. Chevron U.S.A., Inc.,* 759 F.2d 1425, 1430 (9th Cir.1985); *cf. Publicover v. Alcoa Steamship Co.,* 168 F.2d 672, 677 (2d Cir.1948) (former 33 U.S.C. § 367, upon which § 2303 is based, did not impose a duty on a vessel owner whose vessel was not in a collision). In any event, subsection (c) of the statute makes it clear that the statutory duty is the same as the general maritime duty described in *Barbetta,* namely, reasonable care under the circumstances. *See Berg,* 759 F.2d at 1430.

**22.** *Grigsby v. Coastal Marine Service of Texas, Inc.,* 412 F.2d 1011, 1021 (5th Cir.1969), *certs. dism'd,* 396 U.S. 1033, 90 S.Ct. 612–13, 24 L.Ed. 2d 531 (1970).

**23.** For this evidence, plaintiffs cite provisions of two international conventions that require masters and chief officers to have certain minimal knowledge of medical care and first aid techniques. *See* International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, App. to Reg. II/2, § 13, *done* July 7, 1978 (entered into force for the United States on Apr. 28, 1984; not ratified by the Cayman Islands), *reprinted in* 6A *Benedict on Admiralty* Doc. 9–38, at 9–199 (7th ed. 1985);

Convention Concerning Health Protection and Medical Care for Seafarers, art. 9(2), *done* Oct. 1987, I.L.O. No. 164 (not yet entered into force), *reprinted in* 6A *Benedict on Admiralty* Doc. 9–9, at 9–40 to 9–40.1 (7th ed. 1988). Further, they supply an expert report by a pilot/marine consultant, Dean Bruch, who all but explicitly states that any ship's officers should know how and when to administer CPR.

Defendants argue that neither convention applies here since the JAYMAT TRIDENT flies the flag of the Cayman Islands, which has ratified neither convention. The Court notes that these conventions, even if not applicable of their own force, may perhaps be evidence of universal custom among oceangoing vessel officers, but that the relationship between custom and conventional international law—exactly what is needed to establish international custom—is hotly debated. Because of Bruch's report, the Court need not address these issues.

**24.** With Captain Jao's deposition testimony that he and Taylor asked the second mate "to examine the collapsed [pilot]—take a look to care of him," plaintiffs suggest that defendants may have voluntarily assumed to do more than was legally required. The Court need not decide whether this evidence is sufficient to support their suggestion, for there is no evidence, as required under *Grigsby* for a "good samaritan" to be liable under general maritime law, that any crewmember placed Bach in any worse position than he would have been otherwise.

**25.** *See Williams v. Adams,* 836 F.2d 958, 961 (5th Cir.) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986)), *reh'g denied mem.,* 844 F.2d 788 (5th Cir.1988); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986) ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

■ Under general maritime law,[26] plaintiffs cannot establish that improper medical attention was the proximate cause of a person's death unless they prove that " 'a proper diagnosis and treatment ... *would likely have prevented* the loss of this life.' " [27]

■ Plaintiffs' own medical expert testified that even if a crewmember had immediately applied CPR to Bach and even if a professional medical crew had boarded the ship immediately thereafter to apply further medical attention, the chances of Bach's dying anyway were, to a reasonable degree of medical certainty, 85% or greater.[28] In other words, the only evidence before the Court shows that it was more probable than not that Bach would have died no matter what treatment was given to him. Thus, it is immaterial that optimal medical attention might have slightly improved Bach's chances of survival.[29]

In sum, plaintiffs have not presented sufficient evidence to create a genuine dispute of material fact whether any improper medical attention on defendants' part was a proximate cause of Bach's death. Thus, summary judgment for defendants is proper.

## IV.

For these reasons,[30] the Court dismisses plaintiffs' complaint with prejudice at their

26. Plaintiffs argue that Louisiana law applies. This is plainly wrong. *See, e.g., Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959). Thus, the Court does not address whether Louisiana courts would extend the "loss of chance at survival" doctrine, *see Hastings v. Baton Rouge General Hospital,* 498 So.2d 713, 720 (La.1986), beyond the narrow confines of medical malpractice actions governed by La.R.S. § 9:2794(A)(3). *See Agoff v. Town of Jean Lafitte,* 464 So.2d 847, 850 (La.App. 5th Cir.1985) (affirming jury verdict for defendant, where he was negligent per se in rendering ambulance care to a fatal heart attack victim, but where there was insufficient evidence to show that it was more likely than not that the victim would have survived had the defendant rendered proper care). *See generally* Annotation, *Medical Malpractice: "Loss of Chance" Causality,* 54 A.L.R.4th 10 (1987). This Court has not found a single maritime case where this rule has been applied against any defendant.

27. *Rewis v. United States [Rewis III],* 503 F.2d 1202, 1204–05 (5th Cir.1974) (quoting *Rewis I,* 369 F.2d 595, 599 (5th Cir.1966) (citing *Sentilles v. Inter–Caribbean Shipping Corp.,* 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959))) (emphasis added in *Rewis III*), *reh'g denied,* 506 F.2d 1386 (5th Cir.1975) (per curiam). While New Mexico law was the governing law in *Rewis,* the Fifth Circuit, in citing to *Sentilles,* looked to general maritime law for its authority on the issue of medical causation.
  *Compare Barrios v. Waterman Steamship Corp.,* 290 F.2d 310, 311 (5th Cir.1961) (affirming judgment for defendant, where decedent seaman disappeared overboard; holding that even if defendant was negligent in not acting quickly enough, such was insufficient for a basis of liability where there was "a complete want of evidence tending to show that [the missing seaman] ... might have been rescued") *with Gardner v. National Bulk Carriers, Inc.,* 310 F.2d

284, 287 (4th Cir.1962) (directing judgment for widow of drowned seaman effort, where "there [was] a reasonable possibility of rescue" had defendant not been negligent in its rescue efforts).

28. This 85% figure was based on Dr. Phillip's assumption that the paramedics would have brought certain equipment (viz., an electrical defibrillator) with them on the ship; there was no evidence that the paramedics who did arrive had such equipment. Dr. Phillips testified that without such equipment, the chances of survival are less than 5% even with CPR.
  In his expert report for plaintiffs, Bruch states that Bach's chances of survival would have been 30% had CPR been commenced within four minutes of his collapse. While the difference between 85% and 70% is immaterial for purposes of this motion, the Court notes that Bruch's report shows no indication that he has any medical expertise and thus that he is qualified to give such an opinion. *See generally* F.R.Ev. 702.

29. *Wilcox,* 586 F.Supp. at 1480; *see Fitzgerald v. Manning,* 679 F.2d 341, 356 & n. 14 (4th Cir. 1982) (applying Virginia law, but noting that the "federal rule" is the same).

30. By Order and Reasons of October 18, 1988, adhered to Minute Entry of November 4, 1988, 708 F.Supp. 772, the Court dismissed plaintiffs' Jones Act and unseaworthiness claims on the ground that Bach was neither an employee nor a seaman as to any of the defendants. The instant Order and Reasons does not depend in any way on the earlier Order and Reasons and would not differ if Bach had been a Jones Act seaman of any of the defendants.
  Because the Court dismisses plaintiffs' complaint on other grounds and because defendants do not raise these issues in their motion, the Court does not address the following several issues:

costs. Judgment shall enter accordingly forthwith. The Court directs all counsel to advise all witnesses under subpoena for trial that the trial is cancelled.

(1) whether plaintiffs have standing to maintain their suit, *see generally Neal v. Barisich, Inc.,* 707 F.Supp. 862, 864 n. 1 (E.D.La.1989) (Carr, J.) (discussing personal representatives);

(2) what damages, if any, may be sought on behalf of the decedent's two adult children, *see Sistrunk v. Circle Bar Drilling Co.,* 770 F.2d 455 (5th Cir.), *reh'g denied mem.,* 775 F.2d 301 (5th Cir.1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1205, 89 L.Ed.2d 318 (1986); *Truehart v. Blandon [Truehart I],* 672 F.Supp. 929, 934 n. 5 (E.D.La.1987); *Neal,* 707 F.Supp. at 871–72 & nn. 38–39;

(3) whether the complaint states a cause of action against the voyage charterer, *see Balfer v. Mayronne Mud & Chemical Co.,* 762 F.2d 432, 435 (5th Cir.1985); and

(4) whether plaintiffs have made an effective Rule 9(h) designation, which precludes them from receiving a jury trial, *see Truehart v. Blandon [Truehart III],* 685 F.Supp. 956, 959 (E.D.La. 1988).